UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

RECEIPT # 56930
AMOUNT $ 150
SUMMONS ISSUED Y-7
LOCAL RULE 4.1
WAIVER FORM
MCF ISSUED
BY DPTY. CLK. M
DATE 6-28-04

| | |
|---|---|
| DAVID JAROSLAWICZ, Derivatively on behalf of PerkinElmer, Inc, A Massachusetts Corporation,<br><br>Plaintiff<br><br>v.<br><br>GREGORY L. SUMME, ROBERT FRIEL, NICHOLAS LOPARDO, GABRIEL SCHMERGEL, KENTON SICCHITANO, and TAMARA ERICKSON,<br><br>Defendants<br><br>-and-<br><br>PERKINELMER, INC., A Massachusetts Corporation,<br><br>Nominal Defendant. | No.<br><br>**SHAREHOLDER DERIVATIVE COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED**<br><br>**04cv11469 GAO**<br><br>MAGISTRATE JUDGE Dein |

Plaintiff, by his undersigned attorneys, for his shareholder derivative complaint, alleges upon information and belief, except as to allegations about himself, which are based upon personal knowledge, as follows:

### NATURE OF ACTION

1.  This is a shareholder's derivative action brought on behalf of nominal defendant PerkinElmer, Inc. ("Perkin" or "the Company"), a Massachusetts corporation with headquarters and principal place of business in Wellesley, Massachusetts. In this action, plaintiff, on behalf of Perkin, alleges that defendants, who are officers and/or directors of the Company, damaged Perkin by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to issue false and misleading statements to the market regarding the Company's

Page 1

earnings and revenues; (iii) exposing the Company to massive liability for securities fraud; (iv) damaging the Company's reputation: and (v) trading Perkin shares while in possession of material, non-public information regarding the true financial condition of the Company.

2.  During the period July 15, 2001 through April 11, 2002 ("the Relevant Period"), defendants caused the Company to issue a series of false and misleading statements regarding the performance of the Company's products and its financial results. In particular, defendants caused the Company to announce that certain highly touted digital cardiac flat panel X-Ray detectors produced by its Optoelectronics unit were commercially viable, when in fact they were not. Defendants then caused the Company to recognize revenue on the shipment of these products, while failing to ensure that the Company's publicly reported financial statements properly accounted for product return and warranty charges required due to an enormous product failure and return rate. The Audit Committee of the board of directors, which was responsible for overseeing the Company's accounting practices and financial reporting throughout the Relevant Period, failed to prevent these unlawful practices.

3.  Defendants' actions and omissions constituted breaches of their fiduciary duties to the Company. By making Perkin appear more successful than it actually was, defendants secured their prestigious positions as officers and/or directors of a public company, as well as their continued lucrative employment with the Company. Defendants were also motivated by their desire to sell their personal holdings of Perkin common stock and increase and maintain and enhance the value of their substantial personal holdings of Perkin shares.

4.  Defendants have harmed the Company by exposing it to huge liability in a consolidated securities class action pending in this Court ("the Class Action") by defrauded purchasers of Perkin stock. In an order dated September 30, 2003 denying the motion to dismiss the Class Action, this Court ruled that, based on many of the facts alleged below, plaintiffs in the Class Action stated claims for securities fraud against the Company and certain of its executives. This Court held, among other things, that certain defendants' insider selling of "substantial blocks" of their holdings during the period when the product return and accounting issues were becoming "increasingly apparent" to them, as well as their motivation to falsify Perkin's

financial performance so as to receive enormous incentive based pay, gave rise to a strong inference of scienter, or fraudulent intent.

## JURISDICTION AND VENUE

5. This Court has diversity jurisdiction over this action pursuant to pursuant to 28 U.S.C. Section 1332.

6. Venue is proper in this Judicial District because many of the acts and transactions alleged herein occurred in substantial part in this judicial district.

## PARTIES

7. Plaintiff David Jaroslawicz held Perkin shares during the Relevant Period, and continues to hold Perkin shares. Plaintiff is a citizen of New York.

8. Nominal Defendant Perkin is a Massachusetts corporation and maintains its executive offices at 45 William Street in Wellesley, Massachusetts. According to its public filings, Perkin is a leading provider of scientific instruments, consumables and services to the pharmaceutical, biomedical, environmental testing and general industrial markets. Perkin designs, manufactures, markets and services products and systems within three businesses, each constituting one reporting segment: (1) Life and Analytical Sciences, which provides drug discovery, genetic screening, and environmental and chemical analysis tools, including instruments, reagents, consumables, and services; (2) Optoelectronics, which provides a range of digital imaging, sensor and specialty lighting components used in the biomedical, consumer products and other specialty end markets; and (3) Fluid Sciences, which provides fluid control and containment solutions for highly demanding environments such as turbine engines and semiconductor fabrication facilities. The Company's X-Ray panel products, as discussed in more detail herein, were part of the Digital Imaging segment in the Optoelectronics unit. The Optoelectronics unit accounted for 31% of the Company's revenues in 2001, and Digital Imaging accounted for 24% of Optoelectronics' revenue. Perkin common stock trades on the New York Stock Exchange.

9. Defendant Gregory L. Summe ("Summe") has been a director of the Company since 1998, and serves as Perkin's Chairman, Chief Executive Officer and President. He also chairs the Board's Executive Committee. For Fiscal Year 2001, Summe received more than $4.8 million in salary and bonus, including a year-end bonus of over $2 million, and forgiveness of an $875,000 loan. Summe also received in Fiscal Year 2001 1.8 million options to purchase Perkin shares. Summe beneficially owns 2.3 million shares of Perkin stock. During the Relevant Period, Summe sold 300,000 shares of Perkin stock for proceeds exceeding $9 million while in possession of material adverse inside information regarding Perkin's financial condition.

10. Defendant Robert Friel ("Friel") has been Senior Vice President and Chief Financial Officer of the Company since 1999. For Fiscal Year 2001, Friel received more than $1 million in salary and bonus, in addition to options to purchase 700,000 shares of Perkin stock. Friel beneficially owns 637,000 shares of Perkin stock. During the Relevant Period, Friel sold 150,000 shares of Perkin stock for proceeds exceeding $4.9 million while in possession of material adverse inside information regarding Perkin's financial condition.

11. Defendant Nicholas Lopardo ("Lopardo") has been a Director of the Company since 1996. During Fiscal Years 2001 and 2002, Lopardo served on the Audit Committee of the Board, and served as its Chairman during Fiscal Year 2001. Lopardo beneficially owns 68,966 shares of Perkin stock.

12. Defendant Gabriel Schmergel ("Schmergel") has been a Director of the Company since 1999. During Fiscal Years 2001 and 2002, Schmergel served on the Audit Committee of the board. Schmergel beneficially owns 31,816 shares of Perkin stock.

13. Defendant Kenton J. Sicchitano ("Sicchitano") has been a Director of the Company since 2001. During Fiscal Years 2001 and 2002, Sicchitano served on the Audit Committee of the Board, and served as its Chairman during Fiscal Year 2002. Sicchitano beneficially owns 26,249 shares of Perkin stock.

14. Defendant Tamara Erickson ("Erickson") has been a Director of the Company since 1995. During Fiscal Year 2001, Erickson served on the Audit Committee of the board. Erickson beneficially owns 43,016 shares of Perkin stock.

15. Defendants Summe and Friel are sometimes collectively referred to as the "Insider Trading Defendants."

16. Defendants Summe, Lopardo, Schmergel, Sicchitano, and Erickson are sometimes collectively referred to herein as the Director Defendants. During Fiscal Year 2003, all of the Director defendants except Summe received as compensation for their board membership $30,000 in cash, an award of 4,228 shares of Perkin common stock worth $40,000, and options to purchase 7,893 shares of Perkin common stock. Defendants Lopardo, Schmergel and Sicchitano receive an additional $10,000 as chairmen of various committees of the Board, as well as additional options to purchase shares of Perkin stock.

17. The Director Defendants and the Insider Trading Defendants are sometimes collectively referred to as "the Individual Defendants."

18. Each of the Individual Defendants, by virtue of his or her management and/or directorship positions, had the duty to exercise due care and diligence and the duty of full and candid disclosure of all material facts related thereto. As corporate fiduciaries, the Individual Defendants were required to exercise reasonable care and prudent supervision of the Company, including assuring the dissemination of truthful information concerning the business, operations, and financial reporting of Perkin.

19. The Individual Defendants were required to supervise the preparation of Perkin's SEC filings and approve any reports concerning the company's financial condition and results of operations, including to assure that the Company complied with Generally Accepted Accounting Principles ("GAAP"). The Individual Defendants likewise had a duty of loyalty to the Company to act in the best interests of the Company and its shareholders.

20. Because of each of the Individual Defendants' positions with Perkin, each knew and had access to non-public information about the business of Perkin, as well as its finances, markets, and present and future business prospects, via access to internal corporate documents (including Perkin's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees,

attendance at management and/or board of directors' meetings and committees thereof, and reports and other information provided to him in connection therewith.

21. The Individual Defendants, as corporate fiduciaries entrusted with non-public information, were obligated to disclose material adverse information regarding Perkin or to abstain from trading on such information.

## SUBSTANTIVE ALLEGATIONS

### July and August 2001

22. On July 15, 2001, defendants caused the Company to announce "record" income for second quarter of Fiscal Year 2001, a 15th consecutive quarter of "double digit" income growth, and that earnings had exceeded consensus estimates:

> - EPS $0.38 from Continuing Operations
>
> - Operating Margin Expands 300 basis points
>
> - 12% Organic Growth in Life Sciences
>
> PerkinElmer, Inc., (NYSE:PKI) today reported second quarter net income from continuing operations of $39 million, up 34% over the second quarter of last year. Second quarter cash earnings per share were $0.38, a 31% increase over the same period in 2000.
>
> "Aggressive actions starting earlier in the year are allowing us to deliver our financial commitments in spite of this difficult economic environment," said Gregory L. Summe, Chairman and Chief Executive Officer.
>
> Revenue for the quarter grew 6% to $391 million on a reported basis. <u>Strong growth in Life Sciences, Digital Imaging, Aerospace and Analytical Instruments offset sharp declines in sales to Semiconductor and Photography markets</u>. The Company announced its intention to sell its Security and Detection Systems business and consequently moved that business to discontinued operations in the quarter. [emphasis supplied].
>
> Operating margins for the quarter expanded by 300 basis points to 16% as all business units achieved operating margin expansion of 170 basis points or more.

> "<u>In the second quarter, we launched a record number of new products and announced several acquisitions and alliances which further improve the growth and value of our portfolio,</u>" noted Summe. [emphasis supplied].

23. With respect to the Optoelectronics division and Digital Imaging segment in particular, the July 15, 2001 press release stated:

> Optoelectronics sales were $108 million, for the quarter, down 6% organically. <u>Double-digit growth in Telecom and Digital Imaging</u> was offset by severe declines in sales to the Photography and Semiconductor markets. Operating margins grew 310 basis points as aggressive cost actions more than offset revenue softness [emphasis supplied].

24. Defendants expanded upon the July 15, 2001 earnings release in a conference call for analysts and shareholders held on July 16, 2001. The conference call transcript was reported in an SEC filing dated July 17, 2001. Therein, Summe stated as follows:

> <u>In spite of difficult economic conditions, PerkinElmer delivered a very strong earnings growth in the second quarter. Specifically, our cash EPS was 38 cents a share, which beats the consensus street estimate and represent a 31-percent increase over the EPS for the second quarter of 2000. This marks our 15th consecutive quarter of delivering double-digit earnings growth and meeting or beating expectations</u>. [emphasis supplied].
>
> Operating margins for the quarter are expanded by 300 basis points, to 16 percent, driven by the success products and a continued focus on our productivity and quality. All of our businesses expanded operating margins by 170 basis points or more. Revenue for the quarter grew six percent to $391 million. Strong sales in Life Sciences, which (added) organic growth to 12 percent, Digital Imaging, Aerospace and Analytical Instruments were partially offset by sharp declines in the semiconductor and the photography markets.

25. In the same conference call on July 16, 2001, Friel stated as follows:

> Overall, we are very pleased with our results for the second quarter. <u>In the midst of a very difficult business environment, we have once again exceeded our earnings commitment, making this</u>

> <u>the 15th consecutive quarter we have achieved double-digit earnings per share growth. Our ability to achieve these results is due to improving portfolio businesses, our relentless focus on improving our operations and an aggressive approach to quality control.</u> [emphasis supplied].
>
> Operating margins in the quarter stand at 300 basis points as our gross margins expanded by 400 basis points, due to volume leverage in our Life Sciences and Instrument businesses and significant cost factors in our Optoelectronics and Fluid Sciences businesses. All the (SCUs) increased operating margins by at least 170 basis points.
>
> <u>Now turning to Optoelectronics, revenue was 108 million, with 20 percent-plus growth in telecom and digital imaging,</u> but offset by softness in photography and semiconductor markets, yielding an overall organic decline of six percent. [emphasis supplied].
>
> Operating margins expanded 310 basis points as the revenue contractions occurred in our lower margin businesses and the impact of aggressive cost and productivity actions, which have been implemented during the previous three quarters, more than offset the revenue.
>
> <u>The Digital Imaging business continues to perform well, with revenues up over 20 percent in the quarter. We recently produced our 100th (raz) panel and shipped our first cardiac panel to (GE Med Systems).</u> [emphasis supplied].

26.     As a result of defendants' very positive statements regarding results in the second quarter of Fiscal Year 2001, along with a series of positive securities analyst reports which followed defendants' announcement of record results and continuing earnings growth, the price of Perkin stock rose 23% from its trading price on July 16, 2001, to $34.48 by July 27, 2001.

27.     Continuing their stream of highly positive announcements, on August 1, 2001, defendants caused the Company to announce the following regarding its "revolutionary" X-Ray panels produced in the Digital Imaging segment of the Optoelectronics unit, and the Company's relationship with General Electric Medical Systems ("GEMS"):

> PerkinElmer Launches Volume Production of Digital Cardiac Flat Panel X-Ray Detectors for GE Medical Systems, First Deliveries in Q2 2001

> <u>PerkinElmer, Inc. (NYSE: PKI) today announced another milestone in its alliance with General Electric Medical Systems (GEMS) in the initial production deliveries of what is expected to be the industry's first fully digital cardiac detector.</u> The new system has the potential to replace conventional cardiac x-ray systems, based on image intensifiers, with high-resolution, digital systems based on amorphous silicon, flat panel technology. [emphasis supplied].
>
> This revolutionary advance in the imaging of the human heart is the product of an ongoing cooperation between PerkinElmer and GEMS. "We are very excited to launch the cardiac detector," noted John J. Engel, President of PerkinElmer Optoelectronics. "<u>This product is on the leading edge for image resolution and quality, and follows on our successful radiography product which went into production early last year.</u> This is another product that will make a dramatic difference in peoples' lives." [emphasis supplied].
>
> <u>PerkinElmer is the exclusive supplier of digital x-ray detectors to General Electric Medical Systems. The amorphous silicon cardiac detector is the engine behind the recently introduced GE Innova(TM) 2000 product, which has been called "a quantum leap forward in cardiac x-ray image quality.</u>" [emphasis supplied].

28.   Defendants' August 1, 2001 press release regarding the performance of the X-Ray panels was a central component of their highly optimistic statements regarding the Company's potential future earnings growth, as repeatedly expressed in their public statements following the end of the second quarter of Fiscal Year 2001.

29.   On August 15, 2001, defendants caused the Company to file its Report on Form 10-Q for the second quarter of Fiscal year 2001, ended July 1, 2001. The Form 10-Q was signed by Friel. According to the Form 10-Q, "the information reflects all adjustments that, in the opinion of management, are necessary to present fairly the Company's results of operations, financial position and cash flows for the periods indicated." With respect to the Optoelectronics division, the Form 10-Q reported as follows:

> Revenues for the second quarter were $108.0 million versus $120.9 million for the prior period, resulting in a decrease of 11%. For the first six months, revenues were $228.9 million versus $235.4 million for the prior period, resulting in a decrease of 3%.

> <u>Higher revenues in telecom and digital imaging</u> were offset by lower revenues in the photography and semiconductor markets which accounted for the decreases in both the quarter and the six month periods. [emphasis supplied].
>
> Operating profit for the second quarter was $16.2 million compared to $22.5 million for the prior period, decreasing 28%, and for the first six months was $34.7 million compared to $42.6 million for the prior period, decreasing 19%. The decline in operating profit for both periods is due to lower revenues, the cost of moving production facilities to lower cost locations and the beneficial impact of nonrecurring credits recorded in the prior year.
>
> Operating profit before net nonrecurring items and goodwill and intangibles amortization for the second quarter was $20.7 million versus $19.4 million for the prior period, increasing 7%, and for the first six months was $40.9 million versus $35.0 million for the prior period, increasing 17%. In the prior year, significant nonrecurring items for the second quarter included restructuring credits and for the six month period, certain nonrecurring pre-tax gains.

30. The statements regarding the Company's results for the second quarter of Fiscal Year 2001 results were false and misleading. While touting the potential of the digital imaging X-Ray panel products produced in the Optoelectronics division, defendants failed to disclose that the production process for the X-Ray panels was flawed, and that many of the X-Ray panels produced by the Company were defective, as detailed below. Defendants further failed to disclose that sales of the X-Ray panels were subject to a right of return, and that the right was frequently being invoked by the Company's main customers for these products. Furthermore, the financial results and net income growth announced by defendants were achieved because defendants failed to properly account for product returns, and instead reported full value of the sales as revenue.

**The Defective X-Ray Panels**

31. Although defendants touted the performance of the Optoelectronics division and the Company's X-Ray panels in their announcements regarding the second quarter of Fiscal Year 2001, and in their August 1, 2001 announcement regarding the Company's relationship with

GEMS, they were aware that these products were in fact not commercially viable. While defendants' statements created the impression that the X-Ray panels were workable products and that the production process for the X-Ray panels had been sufficiently refined, defendants failed to disclose that large numbers of X-Ray panels were defective and were being returned to the Company by GEMS and other customers.

32.     The X-Ray panels were fabricated in the Company's Santa Clara, California facility. Each panel took approximately 6 months to produce due to the required 700 step process necessary to create the product in the facility's "clean" rooms. Once completed, the panels were shipped to GEMS, and the Company billed GEMS for each panel upon shipment, with GEMS receiving an absolute right of return. Throughout the Relevant Period, GEMS regularly returned defective panels to the Company, up to approximately 40 panels by the end of Fiscal Year 2001, at $100,000 per panel. Notwithstanding these returns, defendants caused the Company to book the "sales" of the X-Ray panels as revenue, in violation of GAAP.

33.     Defendant Summe was personally aware of the details of the Company's relationship with GEMS, based on his prior employment as a general manager with General Electric ("GE") and resulting relationships with GE management, through which he had procured the GEMS contract. Summe maintained the GEMS account himself and personally handled Perkin's relationship with GEMS. He was therefore aware of the enormous failure rate of the panels, that GEMS had complained about performance problems with the panels, which included deterioration in the microlayers of glass and chemicals that were part each panel, and that Perkin was billing GEMS for the panels immediately upon shipment. Summe also knew that the Company improperly recognized revenue on these transactions.

**October 2001-December 2001**

34.     On October 17, 2001, defendants issued a press release announcing results for the third quarter of Fiscal Year 2001. Defendants caused the Company to announce yet another increase in quarterly earnings per share, along with more "double digit" earnings growth:

Page 11

> BOSTON--(BUSINESS WIRE)--Oct. 17, 2001-- PerkinElmer, Inc. (NYSE:PKI) today reported that third quarter net income grew 16% to $40 million versus the same period in 2000. Net income from continuing operations was nearly $30 million, up 29% over the third quarter of last year. Third quarter earnings per share were $0.38 compared to $0.33 for the same period in 2000. EPS from continuing operations increased 27% year-over-year.
>
> "PerkinElmer has again delivered double-digit earnings growth - our 16th consecutive quarter - despite a slow economy," said Gregory L. Summe, Chairman and Chief Executive Officer. "The third quarter was also pivotal in the transformation of PerkinElmer. Consistent with the goal of shifting our portfolio to higher growth, we announced over $1 billion of acquisitions and divestitures. <u>We are now well positioned for growth in our three core businesses - Life Sciences, Optoelectronics and Instruments.</u>"

35. With respect to the Optoelectronics division and its digital imaging products, the October 17, 2001 press release stated as follows:

> <u>The company announced another milestone in its alliance with General Electric Medical Systems in the initial production deliveries of the industry's first fully digital cardiac detector. The new system has the potential to replace conventional cardiac x-ray systems, based on image intensifiers, with high-resolution, digital systems based on amorphous silicon, flat panel technology. PerkinElmer also entered into a strategic partnership with Elekta, a developer of cancer therapies, to supply its amorphous silicon panels for advanced imaging in cancer treatments.</u>[emphasis supplied].
>
> Optoelectronics sales were $97 million for the quarter, down 16%. <u>Double-digit growth in Digital Imaging</u> was offset by continued declines in sales to the photography and semiconductor end markets. Operating margins were 19% reflecting aggressive cost actions begun earlier in the year and continued benefits from low-cost manufacturing operations. [emphasis supplied].

36. On October 29, 2001, defendants caused the Company to file its Form 10-Q for the third quarter of Fiscal year 2001, ended September 30, 2001. According to the Form 10-Q, "the information reflects all adjustments that, in the opinion of management, are necessary to present fairly the Company's results of operations, financial position and cash flows for the

Page 12

periods indicated." The Form 10-Q was signed by Friel. With respect to the Optoelectronics division, the Form 10-Q reported as follows:

> Revenues for the third quarter were $97.2 million versus $126.3 million for the prior period, resulting in a decrease of 23%. For the first nine months, revenues were $326.1 million versus $361.7 million for the prior period, resulting in a decrease of 10%. On an organic basis, revenues for the third quarter decreased 16% versus that of the comparable period in prior year. The decrease reflects industry-wide declines in the telecom, semiconductor and photography markets.
>
> Operating profit for the third quarter was $14.2 million compared to $21.3 million for the prior period, decreasing 33%, and for the first nine months was $48.9 million compared to $64.0 million for the prior period, decreasing 24%. The decline in operating profit for both periods is due to lower revenues, the cost of moving production facilities to lower cost locations and costs associated with streamlining operations.
>
> Operating profit before net nonrecurring items and goodwill and intangibles amortization for the third quarter was $18.2 million versus $23.3 million for the prior period, decreasing 22%, and for the first nine months was $59.1 million versus $58.3 million for the prior period, increasing 1%. Operating profit before nonrecurring items and goodwill and intangible amortization increased as a percentage of sales to 19% for the quarter and 18% for the nine-month period ended September 30, 2001 versus 18% and 16% for the respective periods in 2000.

37.     The statements regarding the Company's results for the third quarter of Fiscal Year 2001 results were false and misleading. While touting the potential of the Optoelectronics division in the October 17, 2001 press release, defendants again failed to disclose that the production process for the X-Ray panels was flawed, and that many of the X-Ray panels produced by the Company were defective. Defendants further failed to disclose that sales of the X-Ray panels were subject to a right of return, and that the right was frequently being invoked by the Company's main customers for these products. Furthermore, the financial results and net income growth announced by defendants were achieved because defendants failed to properly account for product returns, as described in more detail below.

38. In early December 2001, while the stock was trading at more than $30 per share, defendants Summe and Friel collectively sold 450,000 shares of Perkin stock for proceeds of exceeding $13.9 million.

**January-February 2002**

39. On January 24, 2002, defendants caused the Company to announce year end results for Fiscal Year 2001, again touting "strong consistent earnings growth" and "excellent progress." According to the press release:

> BOSTON--(BUSINESS WIRE)--Jan. 24, 2002-- PerkinElmer, Inc. (NYSE:PKI) today announced that cash earnings per share for 2001 increased 18% to $1.09 compared to $0.92 for 2000. Net income from continuing operations grew to $117 million for the year.
>
> "<u>Our ability to deliver strong, consistent earnings growth, particularly in this difficult economic environment, is a testament to the effectiveness of our management and operational processes,</u>" said Gregory L. Summe, chairman and CEO of PerkinElmer. "<u>In addition, the company continued to make excellent progress on its strategy of moving the business mix toward higher growth.</u>" [emphasis supplied].
>
> Operating profit in 2001 grew 16% to $192 million on revenue of $1.3 billion, which was flat on a year-over-year basis. Operating margins for the year expanded by 200 basis points to 14.4%.
>
> Commenting on the fourth quarter, Summe said, "The magnitude of change in our portfolio during this period was unprecedented. In November, we completed the acquisition of Packard BioScience, adding highly complementary strengths in automated liquid handling and sample preparation, as well as biochip technologies. The company also announced the sale of three non-strategic businesses for approximately $185 million in cash proceeds, which will fuel our future growth."
>
> For the fourth quarter of 2001, revenue was $361 million, down 4% versus the same period in the previous year. Operating margins in Q4 expanded 30 basis points to 14.8%.

40. With respect to the Optoelectronics division in particular, the January 24, 2002 press release stated as follows:

> In Optoelectronics, <u>strong double-digit growth in digital imaging and sensors</u> was offset by continued weakness in the photography and semiconductor markets, which drove revenue contraction of 22% organically to $90 million, negatively affecting operating margins, which decreased to 11%. Operating profit for 2001 was down 18% to $69 million on revenue of $416 million, which contracted 10% organically. Operating margins for the full year were 16.5% compared to 16.8% for 2000. During the year, the unit implemented aggressive cost and structural actions that position it for future growth in the high potential biomedical and telecommunications markets.

41. On February 7, 2002, Perkin confirmed 2002 earnings guidance of $1.24-$1.26 per share, a substantial increase over Fiscal year 2001 results of $1.09, during its presentation at the 2002 Merrill Lynch Pharmaceutical, Biotechnology & Medical Device Conference.

42. The optimistic statements regarding the Company's results for the fourth quarter and year end of Fiscal Year 2001 results, as well as its earnings guidance for Fiscal year 2002, were false and misleading. While touting "strong, consistent earnings growth" on the January 24, 2002 press release, defendants failed to disclose that the production process for the X-Ray panels, one of the Company's featured products, was flawed, and that many of the X-Ray panels produced by the Company were defective. Defendants further failed to disclose that sales of the X-Ray panels were subject to a right of return, and that the right was frequently being invoked by the Company's main customers for these products. Furthermore, the financial results and net income growth announced by defendants were achieved because defendants failed to properly account for product returns, as described in more detail below.

## THE "REORGANIZATION" OF OPTOELECTRONICS

43. On March 1, 2002, in contrast to the highly positive statements issued in the months before, defendants caused Perkin to issue a press release announcing that the Optoelectronics unit would suddenly be reorganized to "reduce costs," and that the Company's

earnings per share for 2002 would be dramatically lower than forecast just several weeks before. According to the press release, "clarity, accountability and simplicity" would be brought to the Optoelectronics unit as a result of the reorganization:

> BOSTON, Mar 1, 2002 (BW HealthWire) -- PerkinElmer, Inc. (NYSE:PKI) today announced that it has reorganized its Optoelectronics unit to reduce costs and better position the business for growth in key markets. <u>The action will result in a restructuring charge against first quarter 2002 earnings</u>. [emphasis supplied].
>
> "We see long-term growth potential for Optoelectronics' products and services in the biomedical and broadband communications segments," said Gregory L. Summe, chairman and chief executive officer of PerkinElmer. <u>"However, we have taken aggressive action in light of the effects of the recession on several of our served markets, notably telecommunications, semiconductors and photography. These actions will allow us to manage lower volumes in these soft markets in the short term, while positioning ourselves for market recovery."</u> [emphasis supplied].
>
> <u>PerkinElmer Optoelectronics has been restructured as a single business organized by function, bringing added clarity, accountability and simplicity to the unit.</u> [emphasis supplied].
>
> <u>Due to the significantly reduced volume in Optoelectronics,</u> coupled with lower than anticipated growth in Life Sciences and Analytical Instruments end markets, the company announced plans to take an additional restructuring charge of approximately $10-$15 million to further enhance its cost position and will reduce its workforce by approximately 500 employees from across the corporation. [emphasis supplied].
>
> <u>PerkinElmer projects cash EPS for the first quarter of 2002 of $0.16-$0.17, excluding the charges noted above. For the full year, cash EPS are estimated to be $1.05-$1.10.</u> [emphasis supplied].

44.     In response to this announcement, the price of Perkin stock fell 31% to $15.75 per share on 18 times normal trading volume, seriously damaging shareholder equity.

45.     On March 28, 2002, defendants caused the Company to file its Form 10-K for Fiscal Year 2001, which was signed by all of the Individual Defendants. In the Form 10-K, defendants represented that the financial results contained therein complied with GAAP.

Defendants repeated substantially the same information announced in the January 24, 2002 press release regarding the Company's Fiscal Year 2001 financial results. All of these financial results were false and misleading. The financial results and net income figures announced by defendants for Fiscal Year 2001 were achieved because defendants failed to properly account for the sale of the Optoelectronics' unit's X-Ray panels during Fiscal Year 2001, as alleged herein.

## "WEAKNESS" IN THE OPTOELECTRONICS UNIT

46. Having announced the reorganization of the Optoelectronics unit on March 1, 2002, on April 11, 2002 defendants finally revealed the true extent of the problems the Company was experiencing in the Optoelectronics unit, and alluded to an imminent "restructuring charge." That announcement set the stage for a $23.5 restructuring charge in the Optoelectronics unit announced on April 25, 2002:

> BOSTON, Apr 11, 2002 (BW HealthWire) -- PerkinElmer, Inc. (NYSE:PKI) today announced that it expects revenues for the first quarter which ended March 31, 2002 to be in the range of $300-$305 million or approximately 10% percent lower than anticipated, based on preliminary results. <u>The company attributed the shortfall primarily to weakness in its Optoelectronics end markets</u>, the deferral of capital spending by Analytical Instruments and Life Sciences customers, and sales force integration activities related to the merger with Packard BioSciences. <u>The company projects cash EPS for the first quarter of 2002 of approximately breakeven, as a result of an operating loss in the Optoelectronics business</u>. These results exclude any asset write-down or restructuring charges.
>
> "The business environment has become very difficult. Customers in every sector are cautious about spending," said Gregory L. Summe, chairman and chief executive officer of PerkinElmer. "Despite the difficult environment, we continue to build the strength of our customer franchises. We believe that the capability of our organization, processes and technology leadership will allow us to successfully weather the current market turbulence."

47. Thus, defendants reported that first quarter Fiscal Year 2002 earnings per share would be "breakeven," although just weeks before they were projected to be up to $.17 per share. In response to this announcement, the price of Perkin stock declined to <u>just $12 per share</u>, 66%

Page 17

lower than the high exceeding $35 per share reached during the Relevant Period. Just months before, defendants Summe and Friel had sold 450,000 shares at prices of more than $30 per share.

## DEFENDANTS' DISCLOSURES VIOLATED GAAP

48. GAAP are those principles recognized by the accounting profession as the conventions, rules and procedures necessary to define accepted accounting practice at a particular time. Regulation S-X (17 C.F.R. §210.4-01(a)(1)), states that financial statements filed with the SEC which are not prepared in compliance with GAAP are presumed to be misleading and inaccurate. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosure which would be duplicative of disclosures accompanying annual financial statements. 17 C.F.R. §210.10-01(a).

49. Defendants accounting for the sales of X-Ray panels violated GAAP in the following manner:

(a) Defendants violated Statement No. 5 of the Financial Accounting Standards Board ("FASB"), Accounting for Contingencies, which provides that an "estimated loss from a loss contingency shall be accrued by a charge to income" where it is "probable that an asset had been impaired or a liability had been incurred at the date of the financial statements, and the loss can be reasonably estimated." Such loss contingencies include "obligations related to product warranties and product defects." Accordingly, pursuant to GAAP, Perkin was required to accrue a reasonable estimate of the costs involved in honoring warranty obligations to customers at the time the X-Ray panels were sold, which it failed to do. Furthermore, since the sales were subject to an absolute right of return, they were contingent sales. According to FASB No. 5, "<u>contingencies that might result in gains usually are not reflected in the accounts since to do so might be to recognize revenue prior to its realization.</u>" [emphasis supplied]. Defendants violated this principle by recognizing revenue upon shipment of the X-Ray panels.

(b)     Defendants violated FASB No. 48, which provides that revenue can be recognized at the time of sale if "only if" the amount of future returns can be reasonably estimated. According to FASB No. 48, recognition of revenue must be "postponed" until the return privilege has substantially expired where, at the time of sale, the amount of future returns cannot be reasonably estimated. "Absence of historical experience" with a product "may impair the ability to make a reasonable estimate." Defendants had no "historical experience" with the "revolutionary" X-Ray panels prior to Fiscal Year 2001. Recognition of revenue on the transactions was therefore improper, particularly in light of what defendants knew about the product's poor quality and performance. Furthermore, under FASB No. 48, revenue "shall be reduced to reflect estimated returns." Defendants knew that product returns were actually occurring, yet failed to properly account for these returns.

(c)     Defendants caused the Company to fail to properly account for inventories. GAAP requires that inventory is required to be recorded at the lower of cost or market value, with losses in worth recognized in the financial statements. During the Relevant Period, the Company's financial statements failed to reflect the write-down of inventory and associated losses in the Optoelectronics unit caused by the return of defective products, which according to the Company's subsequent disclosures in April 2002, totaled at least $23.5 million.

50.     Defendants represented that the financial results they reported for the Company during the Relevant Period were prepared in accordance with GAAP, and represented that the reported results reflected all adjustments, consisting of normal recurring accruals, necessary for a fair presentation thereof. As specified above, however, defendants' representations concerning the Company's financial results during the Relevant Period were false and misleading in numerous material respects:

(a)     Defendants falsely stated that the Company's financial statements fairly presented the Company's financial condition;

(b)     Defendants failed to disclose that the Company's internal controls were grossly inadequate and, as a result, the Company's ability to record, process, summarize, and report financial data in its financial statements was seriously deficient;

(c) Defendants violated the principle that financial reporting should provide information that is useful to present to potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Statement of Concepts No. 1, §34);

(d) Defendants violated the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, §40);

(e) Defendants violated the principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. That principle is particularly significant in the context of publicly-traded entities such as Perkin. The officers of such companies voluntarily accept wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, §50);

(f) Defendants violated the principle that financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' expectations about future enterprise performance, those expectations are commonly based, at least in part, upon evaluations of past enterprise performance (FASB Statement of Concepts No. 1, §42);

(g) Defendants violated the principle that financial reporting should be reliable and represent what it purports to represent. The notion that information should be reliable as well as relevant is central to accounting (FASB Statement of Concepts No. 2, §§58-59);

(h) Defendants violated the principle of completeness, which requires that nothing is left out of a company's financial statements that may be necessary to ensure that they validly represent underlying events and conditions (FASB Statement of Concepts, No. 2, §79); and

(i) Defendants violated the principle that conservatism must be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, §§95, 97).