51.  Further, the undisclosed adverse information concealed by defendants during the Relevant Period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

## THE $23.5 MILLION RESTRUCTURING CHARGE

52.  On April 25, 2002, defendants caused the Company to announce that as a result of a restructuring charge, the Company would earn only one penny per share, and incur a huge "GAAP basis" loss of $.26 per share for the first quarter. Defendants announced as follows:

> BOSTON, Apr 25, 2002 (BW HealthWire) -- PerkinElmer, Inc. (NYSE:PKI) today announced first quarter 2002 cash earnings per share of $0.01 on revenue of $305 million from continuing operations. For the same period last year, cash earnings per share were $0.21 on revenue of $335 million. The company also announced that it was increasing its focus on the health sciences market by placing its telecom component and entertainment lighting businesses under strategic review. <u>Additionally, during the quarter, it took charges of $10.7 million for restructuring actions to further improve its cost position, and $23.5 million for inventory in the Optoelectronics business unit. With these charges, the company reported a GAAP basis loss of $0.26 per share from continuing operations.</u> [emphasis supplied].

53.  The $23.5 million restructuring charge was further described in the Company's Report on SEC Form 10-Q for the first quarter of Fiscal Year 2002, filed on May 15, 2002:

> Revenues for the first quarter of 2002 were $72.8 million versus $120.9 million for the first quarter of 2001, resulting in a decrease of 40%. The decrease reflects the disposals of the Voltarc business and certain product lines subsequent to the first quarter of 2001. In addition, industry-wide declines in sales to the telecom, semiconductor and selective lighting markets more than offset sales growth in the Company's sensors products. On an organic basis, revenues for the first quarter of 2002 decreased 24% versus that of the comparable period in prior year.
>
> <u>The reported operating loss for the first quarter was $34.1 million</u>

> compared to a profit of $18.5 million for the first quarter of 2002, decreasing $52.6 million. The decrease in operating profit reflects the $23.5 million inventory adjustment taken as a result of significantly lower volumes experienced in several key markets, as well as the lower revenues and associated lower utilization of production capacity. [emphasis supplied].
>
> The adjusted operating loss before the $23.5 million inventory write-down, net nonrecurring items and goodwill and intangibles amortization for the first quarter of 2002 was $5.0 million versus an adjusted operating profit of $20.2 million for the first quarter of 2001.

54.     The $23.5 million restructuring charge for an "inventory adjustment" in the Optoelectronics segment was required due to defendants' improper accounting practices throughout the Relevant Period, as described herein. For the second, third and fourth quarters of Fiscal Year 2001, the Company had touted "double digit" growth in its Digital Imaging segment. The Company only achieved this result by failing to follow GAAP by recognizing revenues on sales of defective X-Ray panels that were subject to a right of return, failing to adequately reserve for returns, and failing to properly write down the value of returned X-Ray panels in a timely manner.

### THE DIRECTOR DEFENDANTS' RESPONSIBILITY FOR INTERNAL ACCOUNTING CONTROLS AND FOR FINANCIAL REPORTING

55.     Each of the Director Defendants had the responsibility to ensure that there existed at Perkin sufficient internal controls to maintain the accuracy of its reported financial results, including revenue recognition. Defendant Summe, as the Company's CEO and President, and the other Director Defendants, each of whom served as members of the Audit Committee during the Relevant Period, had the responsibility to ensure that Perkin had sufficient accounting controls to insure the accuracy of its reported financial results.

56.     Furthermore, as members of the Audit Committee, defendants Lopardo, Schmergel, Erickson and Sicchitano were charged, according to Appendix D to Statement on Auditing Standards No. 55, *Consideration of the Internal Control Structure in a Financial*

Statement Audit ("SAS 55"), with objectives such as (i) making certain that "[t]ransactions are recorded as necessary . . . to permit preparation of financial statements in conformity with generally accepted accounting principles . . . and to maintain accountability for assets," and (ii) making certain that "[t]he recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences."

57. As described in SAS 55, the applicability and importance of specific control environment factors, accounting system methods and records and control procedures that an entity should establish should be considered within the context of such criteria as an entity's size, its organization and ownership characteristics, the nature of its business, the diversity and complexity of its operations, the entity's method of processing data, and its applicable legal and regulatory requirements. The larger the entity, the more complex, diverse and sophisticated the entity's business becomes, and the greater is the importance of accounting systems and controls. Moreover, public ownership of such an entity customarily requires a sophisticated internal control structure to ensure that transactions are accurately recorded and that, prior to the public disclosure of any financial information, such transactions are compared to the existing assets to eliminate any discrepancies between the recorded and actual amounts.

58. According to SAS 55:

> Establishing and maintaining an internal control structure is an important management responsibility. To provide reasonable assurance that an entity's objectives will be achieved, the internal control structure should be under ongoing supervision by management to determine that it is operating as intended and that it is modified as appropriate for changes in conditions. [emphasis supplied].

59. When management permits a condition to exist in the company's internal control structure such that:

> the design or operation of one or more of the internal control structure elements does not reduce to a relatively low level the risk that errors or irregularities in amounts that would be material in relation to the financial statements . . . may occur and not be

> detected within a timely period by employees in the normal course
> of performing their assigned functions,

such condition is defined by Statement on Auditing Standards No. 60, <u>Communications of Internal Control Structure Related Matters Noted in an Audit</u> ("SAS 60"), as a "material weakness" in the company's internal control structure.

60.  Due to the Director Defendants' total abdication of their duties as members of the Board and/or the Audit Committee, they permitted material weaknesses in the Company's internal control structure such that the Company improperly recognized revenue.

## DEFENDANTS PROFITED FROM THE MISSTATEMENTS

61.  As a result of defendants' false and misleading statements, Perkin's stock traded at artificially inflated levels through the Relevant Period. The Insider Trading Defendants knew that revenues were being inflated through improper accounting.

62.  Notwithstanding their access to this information as a result of their status as directors and/or officers of the Company and their corresponding duty either to refrain from trading or to disclose the adverse material facts set forth herein, the Insider Trading Defendants sold Perkin shares at artificially inflated prices while in possession of material, nonpublic information. These trades were unusual in timing and amount, and were made in order to profit from Perkin's inflated stock price: defendant Summe's trade was his first since early 2000, and defendant Friel's trade was his first sale of Perkin stock. The insider trading during the Relevant Period is summarized below:

| Name | Date | No. Shares Sold | Avg. Price | Approx. Proceeds |
|---|---|---|---|---|
| G. Summe | 12/5/2001 | 300,000 | $30.04 | $9,012,000 |
| R. Friel | 12/6/2001 | 150,000 | $33.10 | $4,965,000 |
| **Totals** | | **450,000** | | **$13,977,000** |

63. Summe also profited by virtue of the Company's incentive based compensation system. Indeed, according to the Company's 2002 proxy statement:

> The Company's Performance Incentive Plan (PIP) provides incentive compensation to certain key employees. Mr. Summe and the other executive officers named in the Summary Compensation Table are participants in the PIP. Although the PIP is the primary source of cash incentives for officers, the Committee may award additional incentives to selected officers outside of the PIP in circumstances in which the Committee determines that an additional incentive established on a different basis is appropriate.
>
> In 2001, the PIP measured Mr. Summe and other senior staff officers (i.e., Finance, Human Resources and Legal) on the basis of growth in earnings per share (EPS) and cash measures. The bonus program for officers and other key employees in the strategic business units (SBU's) were measured on SBU net operating profit after tax (NOPAT), cash measures, and achievement of goals related to integrating acquisitions and facilitating divestitures. Each participant was assigned a target incentive, expressed as a percentage of base salary ranging between 10% and 100%. The target percentage represents the amount of the incentive award if performance targets are met. The targets are generally based on the performance of the participant's SBU or strategic business enterprise (SBE). Performance targets for certain officers and other corporate participants are based on consolidated performance. For SBU/ SBE managers and participants, performance targets are based on SBU/ SBE consolidated performance. The actual incentive award is determined by multiplying the target incentive by a formula performance factor based upon actual performance compared to the target performance.
>
> In 2001, Mr. Summe's target bonus was 100% of base salary. His target PIP was based on consolidated performance. <u>For 2001, the actual EPS and cash measures exceeded targets. As a result, he received a PIP award of $1,360,000, which represents 160% of his target incentive. In addition, the Board awarded Mr. Summe an additional bonus of $815,000 under the CEO Incentive Plan based on the CEO evaluation by the Compensation Committee of his accomplishments against additional performance measures under three categories: strategic — 40%; operational — 30%; and organizational — 30%.</u>
>
> In February 2000, the Company provided Mr. Summe with a full recourse interest free loan of $875,000, <u>which included a</u>

<u>forgiveness feature whereby the loan would be forgiven based on Mr. Summe meeting or exceeding significant performance goals. The loan was forgiven on December 31, 2001 based upon the Company having exceeded the performance goal of 50% growth in EPS over 1999 in two years or less (adjusted for the impact of acquisitions and divestitures).</u> [emphasis supplied].

64.   Thus, for Fiscal Year 2001, Summe received $4.8 million in compensation, in part by virtue of the unlawful conduct alleged herein.

## DERIVATIVE ACTION ALLEGATIONS

65.   Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23.1 on behalf of Perkin to enforce the claims of Perkin against the Individual Defendants, which may properly be asserted by Perkin and which Perkin has failed to enforce.

66.   The wrongs complained of herein occurred during the Relevant Period, during which time plaintiff was a Perkin shareholder. Plaintiff continues to hold shares in Perkin. Hence, plaintiff has standing to bring this derivative action on behalf of Perkin to recover damages for all of the conduct described in this complaint.

67.   Plaintiff will fairly and adequately protect the interests of Perkin and its shareholders in enforcing the rights of Perkin against the Individual Defendants. Plaintiff's attorneys are experienced in this type of litigation and will prosecute this action diligently on behalf of Perkin to insure the rights of the Perkin. Plaintiff has no interests adverse to Perkin.

## THE INDIVIDUAL DEFENDANTS HAVE DAMAGED PERKIN

68.   By reason of their positions as fiduciaries of Perkin and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed to Perkin fiduciary obligations of fidelity, trust, loyalty and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest and equitable manner, and were and are required to act in furtherance of the best interests of the Company and

its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

69. Each defendant owed to Perkin a fiduciary duty to exercise due care and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, as well as the highest obligations of good faith and fair dealing.

70. In addition, as officers and/or directors of a public company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's operations, services, management, projections and forecasts so that the market price of the Company's common stock would be based, at all pertinent times, on truthful and accurate information.

71. The Individual Defendants either directly participated in the decisions to release the false and misleading press releases and SEC filings complained of herein, and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially misleading nature, or knew or were reckless in not knowing that such violations were occurring, and took no action to prevent or remedy the situation.

72. Defendants caused Perkin to engage in a course of conduct which was designed to and did artificially inflate the market price of Perkin's securities and deceive the investing public regarding Perkin's financial reporting and business prospects. Defendants undertook this scheme to prolong the appearance of good fortune at Perkin, profit personally by trading while in possession of material, non-public information concerning the true financial condition of the Company, and maximize the value of their substantial personal holdings of Perkin stock.

73. Defendants either knew or were reckless in not knowing that the illegal acts and practices and misleading statements and omissions described herein would adversely affect the integrity of the market for Perkin's securities and would artificially inflate the prices of those securities. Perkin's stock reached more than $33 per share during the Relevant Period, yet was trading at approximately $12 per share after the truth regarding the Company's false financial statements was finally disclosed.

74. Defendants, by acting as alleged herein, in bad faith exposed Perkin to massive liability under the federal securities laws. As a result of the dissemination of the false and misleading statements described herein, the market price of Perkin stock was artificially inflated. That has resulted in the Company being subjected to the Class Action, in which allegations of securities fraud against the Company have now been upheld.

75. Perkin has been damaged by its exposure to multi-million dollar damages claims by the members of the class in the Class Action, as well as to the substantial legal and other professional expenses to be incurred in connection with the Class Action. As a direct result of certain defendants' wrongful conduct and violations of the federal securities laws, Perkin has been forced to expend significant sums of money, including internal investigation costs.

76. In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

## DEMAND IS EXCUSED FOR FUTILITY

77. Demand on Perkin to bring this action has not been made and is not necessary because such demand would be futile. Perkin is controlled by its board of directors. As described herein, the Director Defendants, comprising a majority of the board (five out of nine), were actively involved in, knew or recklessly disregarded the adverse non-public material facts regarding Perkin alleged herein, and/or illegally profited from the misconduct. The Director Defendants, due to their participation in the wrongful acts alleged and their potential individual financial exposure, are not disinterested and cannot exercise independent business judgment on the issue of whether Perkin should prosecute this action. As a result, demand on Perkin and its board of directors is futile and therefore excused.

78. Among the facts demonstrating the futility of demand are the following:

(a) Defendant Summe, as Chairman of the Board, CEO and President, respectively, and as one of the Company's largest individual shareholders, was actively involved in the day-to-day management of Perkin and was directly responsible for the acts and omissions described

herein, including but not limited to the false and misleading statements and omissions of material facts made in Perkin's public filings and statements. Indeed, this Court has upheld claims for fraud against Summe. Under these circumstances, he would never vote to enforce the Company's rights against himself.

(b)   Defendant Summe sold hundreds of thousands of shares of Perkin stock while in possession of material adverse inside information that the Company had engaged in improper revenue recognition and financial reporting practices, and that the price of the Perkin stock was therefore artificially inflated. This Court has held that Summe's trades were probative of fraudulent intent. Summe benefited from the artificial inflation of Perkin stock his misconduct had created, in breach of his fiduciary duties of loyalty to Perkin and its shareholders. He also improperly secured incentive based compensation and bonus payments. Summe would never vote to investigate his own misconduct or to sue himself for breach of fiduciary duty.

(c)   The Director Defendants other than Summe did nothing to prevent the insider trading engaged in by defendant Summe, or the substantial insider trading engaged in by defendant Friel, as alleged herein. These Directors knew of the unlawful acts, participated in the actions of their colleagues, and failed to prevent these breaches of the duty of loyalty. These Directors would never sue themselves or their colleagues to recover said insider trading proceeds.

(d)   Defendant Summe is the Chairman, CEO and President of Perkin. It is inconceivable that any of the other Director Defendants would vote to sue the Company's most powerful officer and director. Indeed, Summe remains as the Company's chairman and principal executive officer even after claims for securities fraud against him and the Company were upheld by this Court, based upon alleged misconduct regarding the Company's accounting for sales of X-Ray panels to GEMS. Having failed to act then, they would certainly never vote to act now.

(e)   Each of the Director Defendants other than defendant Summe receives at least $70,000 in cash and stock compensation for their service on the board. None of these Director Defendants would jeopardize the significant cash and stock benefits they receive by virtue of their membership on the board of directors (or the prestige of serving on the board of a large

publicly traded corporation like Perkin) by taking a position adverse to defendant Summe, the Chairman of the Board and the Company's dominant officer.

(f)   During some or all the Relevant Period, defendants Lopardo, Erickson, Sicchitano and Schmergel served on the Company's Audit Committee. The Audit Committee should properly have been the keystone of Perkin's corporate governance, finance and internal audit function. Instead, the Director Defendants failed to ensure that Perkin's Audit Committee was an informed, vigilant and effective overseer of the Company's financial reporting process and its internal control systems. The Director Defendants either knew or should have known that Perkin lacked an adequate system of internal controls. The service on the Audit Committee by these defendants was a sham in that they took no action whatsoever to assure that such a system of internal controls was in place, or to assure that proper revenue recognition practices were being followed. Throughout the Relevant Period, these defendants knew that Perkin was aggressively promoting the X-Ray panels as a central component of the Company's purported earnings growth and potential, as confirmed by the Company's press releases. Defendant Summe personally managed the Company's relationship with GEMS, the largest customer for the Company's X-Ray panel products. Nevertheless, notwithstanding the risks associated with Summe's personal control over the GEMS account, these directors failed to diligently monitor Summe's conduct, or the manner in which the Company accounted for sales of the X-Ray panels, an admittedly new product with no sales or performance history. They further failed to ensure that proper oversight systems were in place to prevent Summe from exploiting his relationship with GEMS to mislead the market regarding the level of the Company's X-Ray panel sales, or the purported "revolutionary" nature and quality of these products. This Court has now upheld claims for fraud based on accounting violations which occurred while defendants Lopardo, Erickson, Sicchitano and Schmergel were responsible for overseeing the Company's accounting function as members of the Audit Committee. They would never investigate these allegations or vote to sue themselves over accounting misconduct which occurred while they served on the Audit Committee.

Page 30

(g) Perkin is and was controlled by its Board of Directors and as described herein, the Director Defendants are ultimately responsible for the Company's financial reporting, and were all involved in the wrongs alleged. They permitted the Company to issue false and misleading press releases and SEC filings regarding the Company's financial results, and regarding the quality and performance of the X-Ray panels. These wrongs have given rise to the Class Action, in which open market purchasers of Perkin stock have sued the Company, Summe and Friel asserting claims under the federal securities laws, based largely on the accounting violations identified herein relating to the sale of X-Ray panels. None of the Director Defendants is in a position to exercise independent business judgment with respect to the claims alleged herein due to his participation in and responsibility for the conduct giving rise to the Class Action, which has damaged and will continue to damage Perkin.

(h) Perkin has agreed to indemnify its directors and officers against liability for acts and omissions occurring in the performance of their duties as directors and officers and maintains insurance policies to cover the costs of such indemnification. Under the terms of those insurance policies, however, claims against directors which are brought by the Company, or other directors, are excluded from coverage. Therefore, Perkin's board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Individual Defendants because to do so would result in the loss of their insurance coverage.

(i) In order to bring this action for breaches of fiduciary duty, the members of Perkin's board would have to sue themselves, and/or their fellow directors and allies in the top ranks of the Company, all of whom have served on the board for at least three years. These personal and business relationships demonstrate that demand would be futile.

(j) No demand has been made on the shareholders of Perkin to cause Perkin to bring this action against defendants on behalf of the company because such an effort would be futile. The shareholders of Perkin do not have the power to collectively act on behalf of the company. All any shareholder or group of shareholders can do is, as plaintiff does here, bring a derivative action, on behalf of Perkin, pursuant to Rule 23.1.

## FIRST CAUSE OF ACTION

## BREACH OF FIDUCIARY DUTY AGAINST ALL DEFENDANTS

79. Plaintiff incorporates by reference the allegations set forth above.

80. In violation of their fiduciary duties to Perkin and its shareholders, defendants issued false and misleading statements to Perkin' shareholders and the investing public regarding the Company's results and business prospects throughout the Relevant Period. By reason of this conduct, defendants have exposed Perkin to potential liability in the Class Action and the cost of defending such litigation. In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing.

81. Consequently, Perkin has been and is being further damaged by defendants' conduct in breach of their fiduciary duties.

## SECOND CAUSE OF ACTION

## GROSS NEGLIGENCE AGAINST ALL DEFENDANTS

82. Plaintiff incorporates by reference the allegations set forth above.

83. The preparation and dissemination of quarterly and annual financial statements that were materially false and inaccurate and not in accordance with GAAP represents a sustained and systematic failure by the Individual Defendants to assure the existence within Perkin of appropriate and adequate internal financial controls and a reasonable information and reporting system necessary to assure the accuracy of the Company's financial reporting.

84. The breach by defendants of their duty to act with reasonable care was grossly negligent, reckless, and lacked a good faith effort by defendants to perform their fiduciary responsibilities.

85. Perkin has been damaged by defendants' gross negligence and reckless disregard of their duties.

## THIRD CAUSE OF ACTION

## BREACH OF CONTRACT AGAINST DEFENDANTS SUMME AND FRIEL

86. Plaintiff incorporates by reference the allegations set forth above.

87. In consideration of the substantial compensation and professional enhancement and prestige, which each of defendants Summe and Friel received as a director and/or officer of Perkin, those defendants contracted with Perkin to act in the best interest of Perkin and to cause Perkin to operate lawfully and properly.

88. Each defendant named as a Perkin officer had a contract with Perkin which he breached by his actions, as set forth herein.

89. By their actions and omissions set forth herein those defendants reached their contractual obligations and commitments to Perkin by not acting in the best interests of Perkin and causing or permitting Perkin to act in unlawful and improper ways.

90. Perkin has been damaged by defendants' breach of their contracts.

## FOURTH CAUSE OF ACTION

## BREACH OF DUTY OF LOYALTY-INSIDER TRADING-AGAINST THE INSIDER TRADING DEFENDANTS

91. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

92. By reason of their positions as directors and/or officers of Perkin during the Relevant Period, at the time the Insider Trading Defendants sold their Perkin shares, each had access to and knew highly material information regarding Perkin, and knew or should have known that the public disclosure of this information would adversely affect the market price of Perkin's stock.

93. In selling their Perkin stock, as set forth above, the Insider Trading Defendants used Perkin's material, non-public information for personal gain, in breach of their fiduciary duties to Perkin and its shareholders.

94. By reason of the aforesaid insider sales, the Insider Trading Defendants profited through their fiduciary positions. Defendants are obliged to disgorge these unlawful profits for the benefit of Perkin.

## FIFTH CAUSE OF ACTION
## UNJUST ENRICHMENT AGAINST SUMME

95. Plaintiff incorporates by reference the allegations set forth in the preceding paragraphs.

96. Defendant Summe received substantial incentive based compensation for Fiscal year 2001 from the Company based on the Company's false and misleading financial statements, and far in excess of the value of his services to the Company.

97. Defendant Summe is obliged to disgorge the compensation paid to him by Perkin for the benefit of Perkin.

## PRAYER FOR RELIEF

*WHEREFORE,* plaintiff, on behalf of Perkin, demands judgment against defendants, and each of them jointly and severally as follows:

A. determining that this suit is a proper derivative action and certifying plaintiff as appropriate representatives of Perkin for said action.

B. declaring that each of the Individual Defendants breached his or her fiduciary duty to Perkin;

C. determining and awarding Perkin the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with interest thereon;

D. awarding plaintiff the costs and disbursements of this action, including reasonable fees and costs to plaintiff's attorneys, accountants and experts;

E. granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED: June 28, 2004

By: *[signature: Michael F. Germano]*

MICHAEL F. GERMANO (BBO NO. 567117)
LAW OFFICES OF MICHAEL F. GERMANO
63 Atlantic Avenue
Boston, Massachusetts 02109
Telephone: (617) 367-5911

ROBERT C. SCHUBERT (BBO NO. 562242)
JUDEN JUSTICE REED
WILLEM F. JONCKHEER
SCHUBERT & REED LLP
Two Embarcadero Center, Suite 1660
San Francisco, California 94111
Telephone: (415) 788-4220

RICHARD BEMPORAD
LOWEY DANNENBERG BEMPORAD &
SELINGER, P.C.
One North Lexington Avenue, 11th Floor
White Plains, New York 10601
Telephone: (914) 997-0500

Attorneys for Derivative Plaintiff

## **VERIFICATION**

I, David Jaroslawicz, hereby certify that I have read the SHAREHOLDER DERIVATIVE COMPLAINT, I have authorized its filing, and that the foregoing is true to the best of my knowledge, information, and belief.

Date: 6-17-04

_____

# CIVIL COVER SHEET

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**I. (a) PLAINTIFFS**
David Jaroslawicz, derivatively on behalf of Perkin Elmer, Inc.

**DEFENDANTS**
Gregory L. Summe, Robert Friel, Nicholas Lopardo, Gabriel Schmergel, Kenton Sicchitano, Tamara Erickson, and Nominal Defendant Perkin Elmer, Inc.

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** New York (NY)
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c) ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)**
Law Office of Michael F. Germano
63 Atlantic Avenue
Boston, MA 02109 (Ph: 617-367-5911)

**ATTORNEYS (IF KNOWN)**

**II. BASIS OF JURISDICTION** (PLACE AN "X" IN ONE BOX ONLY)
- ☐ 1 U.S. Government Plaintiff
- ☐ 2 U.S. Government Defendant
- ☐ 3 Federal Question (U.S. Government Not a Party)
- ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** (PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT) (For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐1 | ☒1 | Incorporated or Principal Place of Business In This State | ☐4 | ☐4 |
| Citizen of Another State | ☒2 | ☐2 | Incorporated and Principal Place of Business In Another State | ☐5 | ☐5 |
| Citizen or Subject of a Foreign Country | ☐3 | ☐3 | Foreign Nation | ☐6 | ☐6 |

**IV. ORIGIN** (PLACE AN "X" IN ONE BOX ONLY)
- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

**V. NATURE OF SUIT** (PLACE AN "X" IN ONE BOX ONLY)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane / ☐ 362 Personal Injury — Med. Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 365 Personal Injury — Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates/etc. |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander / ☐ 368 Asbestos Personal Injury Product Liability | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 650 Airline Regs. | ☐ 830 Patent | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine / **PERSONAL PROPERTY** | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product Liability / ☐ 370 Other Fraud | ☐ 690 Other | | ☐ 850 Securities/Commodities/Exchange |
| ☒ 160 Stockholders' Suits | ☐ 350 Motor Vehicle / ☐ 371 Truth in Lending | **LABOR** | **SOCIAL SECURITY** | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability / ☐ 380 Other Personal Property Damage | ☐ 710 Fair Labor Standards Act | ☐ 861 HIA (1395ff) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury / ☐ 385 Property Damage Product Liability | ☐ 720 Labor/Mgmt. Relations | ☐ 862 Black Lung (923) | ☐ 892 Economic Stabilization Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 863 DIWC/DIWW (405(g)) | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 864 SSID Title XVI | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | **HABEAS CORPUS:** | ☐ 865 RSI (405(g)) | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General / ☐ 535 Death Penalty | | ☐ 900 Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 540 Mandamus & Other | **FEDERAL TAX SUITS** | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 550 Civil Rights | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 555 Prison Condition | ☐ 871 IRS — Third Party 26 USC 7609 | |

Labor additional: ☐ 730 Labor/Mgmt. Reporting & Disclosure Act; ☐ 740 Railway Labor Act; ☐ 790 Other Labor Litigation; ☐ 791 Empl. Ret. Inc. Security Act

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE BRIEF STATEMENT OF CAUSE. DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)
Shareholder derivative action arising out of breaches of fiduciary duties, gross negligence, breaches of contract, and unjust enrichment of directors and officers of company.

**VII. REQUESTED IN COMPLAINT:** CHECK IF THIS IS A CLASS ACTION ☐ UNDER F.R.C.P. 23   DEMAND $ _____   CHECK YES only if demanded in complaint: JURY DEMAND: ☒ YES ☐ NO

**VIII. RELATED CASE(S) IF ANY** (See instructions): JUDGE O'Toole   DOCKET NUMBER 02-11314-GAO

DATE 6-28-04   SIGNATURE OF ATTORNEY OF RECORD: /s/ Michael F. Germano

**FOR OFFICE USE ONLY**
RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

1. TITLE OF CASE (NAME OF FIRST PARTY ON EACH SIDE ONLY) __David Jaroslawicz v. Gregory L. Summe__

2. CATEGORY IN WHICH THE CASE BELONGS BASED UPON THE NUMBERED NATURE OF SUIT CODE LISTED ON THE CIVIL COVER SHEET. (SEE LOCAL RULE 40.1(A)(1)).

   X   I.    (160), 410, 470, R.23, REGARDLESS OF NATURE OF SUIT.

   ___  II.   195, 368, 400, 440, 441-444, 540, 550, 555, 625, 710, 720, 730,   *Also complete AO 120 or AO 121
              740, 790, 791, 820*, 830*, 840*, 850, 890, 892-894, 895, 950.      for patent, trademark or copyright cases

   ___  III.  110, 120, 130, 140, 151, 190, 210, 230, 240, 245, 290, 310,
              315, 320, 330, 340, 345, 350, 355, 360, 362, 365, 370, 371,
              380, 385, 450, 891.

   ___  IV.   220, 422, 423, 430, 460, 510, 530, 610, 620, 630, 640, 650, 660,
              690, 810, 861-865, 870, 871, 875, 900.

   ___  V.    150, 152, 153.

   **04 CV 11469 GAO**

3. TITLE AND NUMBER, IF ANY, OF RELATED CASES. (SEE LOCAL RULE 40.1(G)). IF MORE THAN ONE PRIOR RELATED CASE HAS BEEN FILED IN THIS DISTRICT PLEASE INDICATE THE TITLE AND NUMBER OF THE FIRST FILED CASE IN THIS COURT.

   __In re PerkinElmer Inc. Securities Litigation (02-11314-GAO)__

4. HAS A PRIOR ACTION BETWEEN THE SAME PARTIES AND BASED ON THE SAME CLAIM EVER BEEN FILED IN THIS COURT?
   YES    (NO)

5. DOES THE COMPLAINT IN THIS CASE QUESTION THE CONSTITUTIONALITY OF AN ACT OF CONGRESS AFFECTING THE PUBLIC INTEREST? (SEE 28 USC §2403)
   YES    (NO)

   IF SO, IS THE U.S.A. OR AN OFFICER, AGENT OR EMPLOYEE OF THE U.S. A PARTY?
   YES    NO  n/a

6. IS THIS CASE REQUIRED TO BE HEARD AND DETERMINED BY A DISTRICT COURT OF THREE JUDGES PURSUANT TO TITLE 28 USC §2284?
   YES    (NO)

7. DO ALL OF THE PARTIES IN THIS ACTION, EXCLUDING GOVERNMENTAL AGENCIES OF THE UNITED STATES AND THE COMMONWEALTH OF MASSACHUSETTS ("GOVERNMENTAL AGENCIES"), RESIDING IN MASSACHUSETTS RESIDE IN THE SAME DIVISION? - (SEE LOCAL RULE 40.1(D)).
   (YES)    NO

   A. IF YES, IN WHICH DIVISION DO ALL OF THE NON-GOVERNMENTAL PARTIES RESIDE?
      (EASTERN DIVISION)    CENTRAL DIVISION    WESTERN DIVISION

   B. IF NO, IN WHICH DIVISION DO THE MAJORITY OF THE PLAINTIFFS OR THE ONLY PARTIES, EXCLUDING GOVERNMENTAL AGENCIES, RESIDING IN MASSACHUSETTS RESIDE?
      EASTERN DIVISION    CENTRAL DIVISION    WESTERN DIVISION

(PLEASE TYPE OR PRINT)
ATTORNEY'S NAME __Michael F. Germano (BBO # 567117)__
ADDRESS __63 Atlantic Avenue, Boston, MA 02109__
TELEPHONE NO. __(617) 367-5911__

(Cover sheet local.wpd - 11/27/00)