UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE PERKINELMER, INC. SHAREHOLDER DERIVATIVE LITIGATION | **Case No. 04-CV-11469 (GAO)** |
| _____ | |
| Consolidated Cases: 04-CV-11469 (GAO) and 04-CV-11599 (GAO) | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT** |
| This Document Relates to All Actions | **FILED ELECTRONICALLY** |

TABLE OF CONTENTS

INTRODUCTION ........................................................................................................... 1

FACTS ......................................................................................................................... 4

    A.   July and August 2001 Disclosures. ............................................................ 4

    B.   The Defective Panels. ............................................................................... 5

    C.   October 2001 Through February 2002 Disclosures. ...................................... 6

    D.   The Optoelectronics Division Is "Reorganized" and Suffers "Weakness" and an

        "Operating Loss." .................................................................................. 7

    E.   The Optoelectronics Division's "Inventory Charge." ................................... 7

    F.   Defendants Were Responsible for The Company's Accounting and Disclosures. ......... 8

    G.   Defendants' Insider Trading and Incentive-Based Compensation. ................. 8

    H.   The Securities Class Action ....................................................................... 9

    I.   Defendants Have Damaged The Company. ................................................. 10

ARGUMENT ................................................................................................................ 10

    A.   Standards For Assessing Demand Futility. ................................................. 10

    B.   Demand On Summe Is Excused. ............................................................... 12

    C.   Demand On The Four Audit Committee Defendants Is Excused. ................. 13

    D.   This Board Cannot Act Independently. ...................................................... 17

    E.   Perkin's Exculpation Provision Does Not Dispose Of Plaintiffs' Claims. ........ 18

    F.   Plaintiffs' Damage Allegations Are Ripe. ................................................... 18

CONCLUSION .............................................................................................................. 20

TABLE OF AUTHORITIES

**Cases**

Aronson v. Lewis, 473 A.2d 805 (Del. Supr. 1984) .......................................................... 11, 12, 17

Daisy Sys. Corp. v. Finegold, 1998 WL 166235 (N.D. Cal. Sept. 19, 1988) ............................... 19

Dollens v. Zionts, 2002 U.S. Dist LEXIS 13511 (N.D. Ill. July 24, 2002) ................................... 12

Emerald Partners v. Berlin, 787 A.2d 85 (Del. Ch. 2001) ............................................................ 18

Grobow v. Perot, 539 A.2d 180 (Del. 1988) .................................................................................. 12

Harhen v. Brown, 431 Mass. 838 (Mass. 2000) ............................................................................ 11

In re Abbott Lab. Deriv. Litig., 325 F.3d 795 (7th Cir. 2003) ..................................................... 18

In re Caremark Int'l, Inc., 698 A.2d 959 (Del. Ch. 1996) ............................................................. 13

In re Cendant Corp Deriv. Litig., 189 F.R.D. 117 (D.N.J. 1999) ................................................. 19

In re FirstEnergy Shareholder Deriv. Litig., 320 F. Supp. 2d 621 (N.D. Ohio 2004) ................. 15

In re General Instrument Corp .Sec Litig., 23 F. Supp. 2d 867 (E.D. Ill. 1998) .......................... 12

In re Oracle Corp. Deriv. Litig., 824 A.2d 917 (Del. Ch. 2003) .................................................. 17

In re Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111 (S.D.N.Y. 2000) ....................... 15, 16

In re Storage Technology Sec. Litig., 804 F. Supp. 1368 (D. Colo. 1992) ............................ 16, 17

In re Symbol Tech. Sec. Litig., 762 F. Supp. 510 (E.D.N.Y. 1991) .............................................. 19

In re United Telecommunications Inc. Sec. Litig., 1993 WL 100202 (D. Kan., March 4, 1993) 20

Johnson v. Hui, 752 F. Supp. 909 (N.D. Cal. 1990) ..................................................................... 12

Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90 (1991) ............................................................... 11

Malpiede v. Townson, 780 A.2d 1075 (Del. 2001) ....................................................................... 18

McCall v. Scott, 239 F.3d 808 (6th Cir. 2001) .................................................................. 12, 15, 17

Mitzner v. Hastings, 2005 U.S. Dist LEXIS 835 (N.D. Cal., January 14 2005) .......................... 15

Rales v. Blasband, 634 A.2d 927 (Del. 1993) ........................................................ 11, 12

Sonkin v. Barker, 670 F. Supp. 249 (S.D. Ind. 1987) ................................................. 19

Strougo v. Carroll, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,815 (Del. Ch. 1991) . 12

**Statutes**

Federal Rule of Civil Procedure 23.1 ......................................................................... 10

## INTRODUCTION

This is a consolidated shareholder derivative action on behalf of PerkinElmer, Inc. ("Perkin" or the "Company"), a publicly traded Massachusetts corporation with its headquarters in Wellesley, Massachusetts.  Perkin provides scientific instruments, consumables and services to the pharmaceutical, biomedical, environmental testing and general industrial markets. Named as defendants are Gregory L. Summe ("Summe"), the Company's Chief Executive Officer, President and Chairman of its Board of Directors; Robert Friel ("Friel"), the Company's Chief Financial Officer; and all the four members of the Audit Committee of Perkin's Board of Directors - Nicholas Lopardo ("Lopardo"), Gabriel Schmergel ("Schmergel"), Kenton J. Sicchitano ("Sicchitano"), and Tamara Erickson ("Erickson"). Summe and the Audit Committee members together constituted a majority of the board (five out of nine) at the time the first complaint in this consolidated action was filed, which is the operative date for determining whether demand on the board should be excused as futile under Fed. R. Civ. P. 23.1.

During the period July 15, 2001 through April 11, 2002 ("the Relevant Period"), defendants caused the Company to issue a series of false and misleading statements regarding the performance of the Company's products and its financial results. In particular, defendants caused the Company to announce that certain highly touted digital CDXR X-Ray panels produced by its Optoelectronics unit were commercially viable, when in fact they were not. Furthermore, defendants caused the Company to improperly recognize revenue on the shipment of these products, while failing to ensure that the Company's financial statements properly accounted for product return and warranty charges required due to an enormous product failure and customer return rate. The Audit Committee of the Board of Directors, which was responsible for overseeing the Company's accounting practices and financial reporting throughout the Relevant

Period, failed to prevent these unlawful accounting practices and the false and misleading disclosures about the Company's Optoelectronics unit and its financial results.

On March 1, 2002, in contrast to the highly positive statements issued in the months before, defendants announced that the Optoelectronics unit would suddenly be reorganized to "reduce costs," and that the Company's earnings per share for 2002 would be dramatically lower than forecast just several weeks before. On April 11, 2002, defendants announced even more disappointing results for the first quarter ("breakeven" instead of 16-17 cents per share reported on March 1, 2002) and an imminent "restructuring charge," causing the Company's share price to plummet to just $12 per share from a Relevant Period high of $35 per share. Finally, in late April, a $23.5 million "restructuring charge" was announced in the Optoelectronics unit. Meanwhile, prior to these negative revelations, defendants Summe and Friel sold a total of approximately $14 million of Perkin stock at prices exceeding $30 per share.

Following these disclosures, defrauded purchasers of Perkin stock filed suit alleging violations of the federal securities laws. By order dated September 30, 2003, this Court upheld a claim for securities fraud against Summe, Friel, and the Company. In re PerkinElmer Inc. Sec. Litig., 286 F. Supp. 2d 46 (D. Mass. 2003). The Court stated that the securities complaint, which is grounded upon many of the same facts alleged here, "offers a sufficiently detailed set of allegations to support its claim that PerkinElmer's statements about the success of the x-ray panels and the Optoelectronics unit were false or misleading." 286 F. Supp. 2d at 54.  The Court further held that defendants' insider trading was probative of fraudulent intent: "An inference of scienter is also supported by the allegation that the two individual defendants both sold substantial blocks of stock during the period when, according to the complaint, the problems with the Optoelectronics division were becoming increasingly apparent to them."   Id. at 55.

In this action, plaintiffs allege that defendants, who are officers and/or directors of the Company, damaged Perkin by deliberately, in bad faith or recklessly: (i) implementing a sham system of internal controls completely inadequate to ensure proper recognition of revenue; (ii) causing the Company to issue false and misleading statements to the market regarding the Company's earnings and revenues; (iii) exposing the Company to massive liability for securities fraud; (iv) damaging the Company's reputation: and (v) selling Perkin shares while in possession of material, non-public information regarding the true financial condition of the Company, or failing to prevent such selling. Plaintiffs assert claims for breach of fiduciary duty, gross negligence, breach of contract, insider trading and unjust enrichment.

In their motion to dismiss, defendants claim that plaintiffs have failed to allege with sufficient particularity that demand is excused, and that plaintiffs' claims for damages are "premature." Defendants are wrong on both counts.

First, the complaint alleges that each director defendant faces a substantial likelihood of liability for breach of fiduciary duty, and is therefore interested for purposes of considering a demand. Specifically, defendant Summe faces a substantial likelihood of liability for breaching his fiduciary duty of loyalty by selling Perkin stock while in possession of material adverse inside information. The four members of the Audit Committee face a substantial likelihood of liability for breaching their fiduciary duties by permitting defendant Summe to make highly positive but false statements regarding the Optoelectronics unit, and to engage in insider trading. As described below, these defendants were on notice of "red flags" indicating there were problems with Perkin's X-ray panel business, but failed to address them. These failures of oversight were the result of a lack of internal controls at the Company and in bad faith. Therefore, demand is excused.

Page 3

Second, contrary to defendants' argument, plaintiffs have alleged specific, measurable damages which are recoverable for the Company. These include disgorgement of insider trading proceeds and incentive-based compensation, damages for loss of reputation and goodwill, and damages for legal and professional expenses incurred in the class action.

## FACTS

**A.    July and August 2001 Disclosures.**

On July 15, 2001, defendants caused the Company to announce "record" income for second quarter of Fiscal Year 2001, allegedly "double digit" income growth, and that earnings had exceeded consensus estimates. ¶22, Shareholder Derivative Complaint filed by plaintiff David Jaroslawicz on June 28, 2004.  With respect to the Optoelectronics division in particular, the press release stated that Telecom and Digital Imaging, which includes sales of the X-Ray panels, experienced "double-digit growth." ¶23.

In a conference call for analysts and shareholders held on July 16, 2001, defendant Friel expanded on the Company's July 15, 2001 press release, noting that the telecom and digital imaging segments experienced 20 percent-plus growth. ¶25.  Friel specifically highlighted that the Company had produced its 100th X-Ray panel and had shipped its first cardiac X-Ray panel to General Electric Medical Systems ("GEMS"). ¶25.  As a result of these statements regarding results in the second quarter of Fiscal Year 2001, the price of Perkin stock rose 23% from its trading price on July 16, 2001, to $34.48 by July 27, 2001. ¶26.

On August 1, 2001, defendants issued a press release touting the Company's X-ray panel technology. The August 2001 press release announced an agreement with GEMS for "volume production" of the Company's "revolutionary" X-Ray panels for use in cardiac X-ray systems. ¶27. According to the press release, "this product is on the leading edge for image resolution and

Page 4

quality, and follows on our successful radiography product which went into production early last year." Id. The press release highlighted that Perkin was the "exclusive supplier of digital x-ray detectors" to GEMS. Id.

On August 15, 2001, defendants caused the Company to file its Report on Form 10-Q for the second quarter of Fiscal year 2001, ended July 1, 2001, which was signed by Friel. ¶29. With respect to the Optoelectronics division, the Form 10-Q disclosed that the telecom and digital imaging segments experienced higher revenues. Id.

**B.     The Defective Panels.**

Although defendants touted the performance of the Optoelectronics division and the Company's X-Ray panels in their announcements regarding the second quarter of Fiscal Year 2001, and in their August 1, 2001 announcement regarding the Company's relationship with GEMS, they were aware that these products were in fact not commercially viable. While defendants' statements created the impression that the X-Ray panels were workable products and that the production process for the X-Ray panels had been sufficiently refined, defendants failed to disclose that large numbers of X-Ray panels were defective and were being returned to the Company by GEMS and other customers. ¶31.

The X-Ray panels were fabricated in California. Each panel took approximately 6 months to produce due to the required 700 step process necessary to create the product in the facility's "clean" rooms. Once completed, the panels were shipped to GEMS, and the Company billed GEMS for each panel upon shipment, with GEMS receiving an absolute right of return. Throughout the Relevant Period, GEMS regularly returned defective panels to the Company, up to approximately 40 panels by the end of Fiscal Year 2001, at $100,000 per panel. Notwithstanding these returns, defendants caused the Company to book the "sales" of the X-Ray panels as revenue, in violation of Generally Accepted Accounting Principles. ("GAAP") ¶32.

Defendant Summe was personally aware of the details of the Company's relationship with GEMS, based on his prior employment as a general manager with General Electric ("GE") and resulting relationships with GE management, through which he had procured the GEMS contract. Summe maintained the GEMS account himself and personally handled Perkin's relationship with GEMS. He was therefore aware of the enormous failure rate of the panels, that GEMS had complained about performance problems with the panels, which included deterioration in the microlayers of glass and chemicals that were part each panel, and that Perkin was billing GEMS for the panels immediately upon shipment. Summe also knew that the Company improperly recognized revenue on these transactions. ¶33.

**C.      October 2001 Through February 2002 Disclosures.**

On October 17, 2001, defendants caused the Company to announce "double digit" earnings growth in the third quarter of Fiscal Year 2001. ¶34.

With respect to the Optoelectronics division, the October 17, 2001 press release announced "another milestone in its alliance with General Electric Medical Systems in the initial production deliveries of the industry's first fully digital cardiac detector. The new system has the potential to replace conventional cardiac X-Ray systems, based on image intensifiers, with high-resolution, digital systems based on amorphous silicon, flat panel technology. PerkinElmer also entered into a strategic partnership with Elekta, a developer of cancer therapies, to supply its amorphous silicon panels for advanced imaging in cancer treatments." Id.

On January 24, 2002, defendants caused the Company to announce results for Fiscal Year 2001, again touting "strong consistent earnings growth" and "excellent progress." Defendants specifically cited "strong double-digit growth in digital imaging and sensors." ¶¶39-40.

On February 7, 2002, Perkin confirmed 2002 earnings guidance of $1.24-$1.26 per share, a substantial increase over Fiscal year 2001 results of $1.09, during its presentation at the 2002 Merrill Lynch Pharmaceutical, Biotechnology & Medical Device Conference. ¶41.

**D.    The Optoelectronics Division Is "Reorganized" and Suffers "Weakness" and an "Operating Loss."**

On March 1, 2002, Perkin announced that the Optoelectronics unit would suddenly be reorganized to "reduce costs," and that earnings per share for 2002 would be dramatically lower than forecast just several weeks before.  The Company stated that it would take a $10-$15 million restructuring charge in part due to "significantly reduced volume" in Optoelectronics. ¶43. In response to this announcement, the price of Perkin stock fell 31% to $15.75 per share on 18 times normal trading volume. ¶44. Similarly, in an April 11, 2002 press release, defendants attributed the earnings shortfall to, among other things, "weakness in its Optoelectronics end markets." Defendants also reported "approximately breakeven" earnings per share for the first quarter "as a result of an operating loss in the Optoelectronics business." In response, Perkin stock declined to just $12 per share, 66% lower than the $35 per share price reached during the Relevant Period. ¶¶46-47.

**E.    The Optoelectronics Division's "Inventory Charge."**

On April 25, 2002, defendants caused the Company to announce that as a result of a $23.5 million "inventory charge," the Company would incur a huge "GAAP basis" loss of $.26 per share for the first quarter. The $23.5 million restructuring charge for an "inventory adjustment" in the Optoelectronics segment was required due to defendants' improper accounting practices throughout the Relevant Period, namely their violating GAAP by recording revenues on sales of defective X-Ray panels that were subject to a right of return, failing to

adequately reserve for returns, and failing to properly write down the value of returned X-Ray panels in a timely manner. ¶54.

## F.    Defendants Were Responsible for The Company's Accounting and Disclosures.

Each defendant had the responsibility to ensure that there existed at Perkin sufficient internal controls to maintain the accuracy of its reported financial results, including revenue recognition. Defendant Summe, as the Company's CEO and President, and the other director defendants, each of whom served as members of the Audit Committee during the Relevant Period, had the responsibility to ensure that Perkin had sufficient accounting controls to insure the accuracy of the Company's reported financial results. ¶¶18-21, 55-60. Throughout the Relevant Period, the Audit Committee defendants knew that Perkin was aggressively promoting the X-Ray panels as a central component of the Company's purported earnings growth and potential, as confirmed by the Company's press releases. These defendants also knew that Summe personally managed the Company's relationship with GEMS, the largest customer for the Company's X-Ray panel products. ¶78.

## G.    Defendants' Insider Trading and Incentive-Based Compensation.

As a result of defendants' statements, Perkin's shares traded at artificially inflated levels through the Relevant Period. Defendants Summe and Friel knew that revenues were being inflated through improper accounting. ¶61.  Nevertheless, these defendants sold Perkin shares at artificially inflated prices while in possession of material, nonpublic information. ¶62.  These trades were unusual in timing and amount, and were made to profit from Perkin's inflated stock price: Summe's trade was his first since early 2000, and Friel's trade was his first sale of Perkin stock. ¶62.  In early December 2001, while the stock was trading at more than $30 per share, Summe and Friel collectively sold 450,000 shares of Perkin stock for proceeds of exceeding

$13.9 million.  ¶38. Summe also profited by virtue of the Company's incentive based compensation system, receiving nearly $2.2 million in bonuses for Fiscal Year 2001 and forgiveness of an $875,000 loan on December 31, 2001. ¶63.

**H.    The Securities Class Action**

Commencing on January 13, 2003, defrauded purchasers of Perkin stock filed class action lawsuits against Perkin, Summe and Friel alleging violations of the federal securities laws. By order dated September 30, 2003, this Court upheld plaintiffs' claims for securities fraud. ¶4. This Court summarized the claim as follows: "Succinctly put, the plaintiffs allege that the defendants' statements spotlighting the successes of the Optoelectronics unit, and its new x-ray panels, inflated the price of PerkinElmer's stock. The plaintiffs allege that these statements were fraudulent because they failed to disclose information known to the defendants indicating that the x-ray panels manufactured and sold were often defective, and further because the company's reported revenues improperly included income from sales of the defective panels, even though many of those sales were later reversed as the result of returns." 286 F. Supp. 2d 52. This Court then held that plaintiffs' securities fraud claims met the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"). This Court held that:

- Plaintiffs had sufficiently alleged that the statements could be of material significance to a reasonable investor in that the Company "used the [Optoelectronics] unit and the product to justify an optimistic forecast for the company's earnings potential." Id. at 53.

- Plaintiffs had sufficiently alleged that defendants issued "materially false statements about the company's current profits by failing to inform the market that sales of this promising product cited by defendants in its statement were subject to a right of return and that the right was being frequently invoked by the company's customers." Id.

- The complaint offered "a sufficiently detailed set of allegations to support its claim that PerkinElmer's statements about the success of the x-ray panels and the Optoelectronics unit were false or misleading." Id.

- Scienter, or fraudulent intent, was alleged by virtue of (1) Summe's and Friel's positions as high ranking officials with Perkin, (2) the allegation that they "sold substantial blocks of stock during the period when, according to the complaint, the problems with the Optoelectronics division were becoming increasingly apparent to them," and (3) Summe's personal incentive to maximize compensation from Perkin's "incentive compensation program that was linked to earnings performance." Id. at 54-55.

## I.    Defendants Have Damaged The Company.

Perkin has been damaged by its exposure to multi-million dollar damages claims by the members of the class in the Class Action, as well as to the substantial legal and other professional expenses to be incurred in connection with the class action.  As a direct result of certain defendants' wrongful conduct and violations of the federal securities laws, Perkin has been forced to expend significant sums of money in its defense. In addition, the Company's reputation in the securities markets has been severely damaged, thereby hampering the Company's ability to secure future business partners and financing. Furthermore, all of the unlawful insider trading proceeds obtained by Summe and Friel, and Summe's incentive based compensation, must be disgorged to the Company. ¶¶61-64, 68-76.

## ARGUMENT

### A.    Standards For Assessing Demand Futility.

Motions to dismiss a derivative complaint for failure to make a pre-litigation demand are considered pursuant to Fed R. Civ. P. 23.1 and the substantive law of the state of incorporation,

here Massachusetts. Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98-99 (1991). As

defendants agree, Massachusetts courts often look to Delaware law in connection with derivative

matters, so plaintiffs will focus on Delaware authorities. See Harhen v. Brown, 431 Mass. 838

(Mass. 2000)(relying on Delaware cases in analyzing demand requirement).

 Rule 23.1 requires that a shareholder seeking to file a derivative action allege that he or

she made a pre-suit demand on the corporation's board of directors, or allege facts showing why

such a demand would have been futile. The complaint must "allege with particularity" the efforts

made to obtain the action the plaintiff desires from the directors, or the reasons for the plaintiff's

failure to obtain the action or for not making the effort.

Under Aronson v. Lewis, 473 A.2d 805 (Del. Supr. 1984), where shareholders file a

derivative suit on behalf of a corporation without making pre-litigation demand, the Court must

consider whether, under the particularized facts alleged, a reasonable doubt is created that: (1)

the majority of the directors considering the demand are disinterested and independent or (2) the

challenged transaction was otherwise the product of a valid exercise of business judgment.

Aronson, 473 A.2d at 814.

Where there is no conscious decision by directors to act or refrain from acting, the

business judgment rule has no application because the absence of board action makes it

impossible to perform the essential inquiry contemplated by Aronson.  Thus, where allegations

involve board inaction, only the first prong of the Aronson test will apply. Rales v. Blasband,

634 A.2d 927, 930 (Del. 1993). Under Rales, the court must determine "whether or not the

particularized factual allegations . . . create a reasonable doubt that, as of the time the complaint

is filed, [a majority of] the board of directors could have properly exercised its independent and

disinterested business judgment in responding to a demand." Rales, 634 A.2d at 934.

The test for pleading demand futility is not nearly as difficult as defendants contend. To establish a reasonable doubt, plaintiffs are not required to plead facts sufficient to support a judicial finding of demand futility. Grobow v. Perot, 539 A.2d 180, 186 (Del. 1988). Nor are plaintiffs required to demonstrate a reasonable probability of success on the merits. Rales, 634 A.2d at 934. Furthermore, whether plaintiffs have alleged a reasonable doubt must be determined from the "accumulation" of all facts. McCall v. Scott, 239 F.3d 808, 816 (6th Cir. 2001).

Under Rales, a director is considered interested when, for example, he or she will receive a personal financial benefit from a transaction that is not equally shared by the stockholders, or when a corporate decision will have a "materially detrimental impact" on a director but not the corporation or its stockholders. Rales, 634 A.2d at 936. While the mere threat of personal liability is not sufficient, reasonable doubt as to the disinterestedness of a director is created when the allegations in the complaint present "a substantial likelihood" of liability on the part of a director. See Rales, 634 A.2d at 936 (quoting Aronson, 473 A.2d at 815).

**B.    Demand On Summe Is Excused.**

Demand on Summe is excused as futile because he is alleged to have engaged in unlawful insider trading, in violation of his fiduciary duty of loyalty to Perkin. Many shareholder derivative cases hold that insider trading claims render directors interested for purposes of considering a shareholder demand. Dollens v. Zionts, 2002 U.S. Dist LEXIS 13511 (N.D. Ill. July 24, 2002); In re General Instrument Corp .Sec Litig., 23 F. Supp. 2d 867, 874 (E.D. Ill. 1998); Johnson v. Hui, 752 F. Supp. 909, 913 (N.D. Cal. 1990); Strougo v. Carroll, [1990 Transfer Binder] Fed. Sec. L. Rep. (CCH) ¶ 95,815 (Del. Ch. 1991).

Defendants concede that this is a proper basis for excusing demand, but contend that the allegations regarding Summe's insider trading are not sufficiently particularized. To the contrary, plaintiffs allege that defendant Summe sold hundreds of thousands of shares of Perkin stock

while in possession of material adverse inside information that the Company had engaged in improper revenue recognition and financial reporting practices, and that the price of Perkin stock was therefore artificially inflated. Indeed, Summe sold at $30 per share, more than twice the price of the stock when the truth was finally revealed. Plaintiffs allege that these trades were suspicious in timing and amount, in that Summe's trade was his first since early 2000. These allegations are sufficient and excuse demand on Summe.

Defendants' argument that Summe's sale of what they deem a small amount of stock does not demonstrate "wrongful intent" has been rejected by this Court. This Court found that similar allegations in the class action were sufficiently particularized to establish a strong inference of insider trading. "An inference of scienter is also supported by the allegation that the two individual defendants both sold substantial blocks of stock during the period when, according to the complaint, the problems with the Optoelectronics division were becoming increasingly apparent to them." 286 F. Supp. 2d 55. The same reasoning applies here to the issue of whether Summe faces a "substantial likelihood of liability" for insider trading.

Finally, Summe made many of the public statements alleged in this case to be false and misleading, and at the time this action was filed, this Court had already upheld a claim against him for fraud, finding that his insider trading was probative of fraudulent intent. Under these circumstances, given the threat of personal liability, a reasonable doubt clearly exists whether Summe could impartially consider a shareholder demand.

## C.    Demand On The Four Audit Committee Defendants Is Excused.

Nonfeasance by directors of their fiduciary duties to discharge supervisory and monitoring responsibilities constitutes a breach of the duty of care and creates a reasonable doubt excusing demand. Under the standards established in In re Caremark Int'l, Inc., 698 A.2d 959 (Del. Ch. 1996), director liability "may be said to arise from an unconsidered failure of the board

to act in circumstances in which due attention would, arguably, have prevented the loss." 698 A.

2d at 967. The <u>Caremark</u> court held that "where a claim of directorial liability for corporate loss

is predicated upon ignorance of liability creating activities within the corporation," a "sustained

or systematic failure of the board to exercise oversight - such as an utter failure to attempt to

assure a reasonable information and reporting system exists - will establish the lack of good faith

that is a necessary condition to liability." <u>Id</u>. at 971.

Plaintiffs have alleged precisely such a failure of oversight by the members of the Audit

Committee. Plaintiffs allege the following regarding the Audit Committee (¶78(f)):

> Throughout the Relevant Period, these defendants knew that
> Perkin was aggressively promoting the X-Ray panels as a central
> component of the Company's purported earnings growth and
> potential, as confirmed by the Company's press releases. These
> defendants also knew that Summe personally managed the
> Company's relationship with GEMS, the largest customer for the
> Company's X-Ray panel products. Nevertheless, notwithstanding
> the risks associated with Summe's personal control over the
> GEMS account, they failed to diligently monitor Summe's
> conduct, or the manner in which the Company accounted for sales
> of the X-Ray panels, an admittedly new product with no sales or
> performance history. They further failed to ensure that proper
> oversight systems were in place to prevent Summe from exploiting
> his relationship with GEMS to mislead the market regarding the
> level of the Company's X-Ray panel sales, or the purported
> "revolutionary" nature and quality of these products. This Court
> has now upheld claims for fraud based on accounting violations
> which occurred while defendants Lopardo, Erickson, Sicchitano
> and Schmergel were responsible for overseeing the Company's
> accounting function as members of the Audit Committee.

Thus, plaintiffs have alleged numerous "red flags" which should have alerted the

members of the Audit Committee to disclosure and accounting risks associated with the

Company's X-ray panels. The cases hold that where board members fail to act in the face of such

"red flags," they face a substantial likelihood of liability for breach of fiduciary duty, and

demand is excused.

For example, in In re Oxford Health Plans, Inc. Sec. Litig., 192 F.R.D. 111 (S.D.N.Y.
2000), demand was excused under Caremark where the directors were on notice of problems
with billing practices and the corporation's computer system, but failed to act, resulting in
corporate liability. Similarly, in McCall v. Scott, 239 F. 3d 808, demand was excused under
Caremark where the directors failed to heed "red flags" indicating that the corporation was
engaged in healthcare billing fraud. See also In re FirstEnergy Shareholder Deriv. Litig., 320 F.
Supp. 2d 621 (N.D. Ohio 2004) (demand excused under Ohio law in derivative action against
directors of utility company where they "ignored warning signs" regarding power plant safety).

Defendants argue that there are no allegations that the Audit Committee was on notice of
any issues which required "special monitoring" or that any oversight systems were "not
adequate." In so doing, defendants repeatedly mischaracterize their role as "outside directors."
On the contrary, the Audit Committee directors were responsible for establishing and monitoring
the Company's accounting and internal controls, but their systematic failure to exercise oversight
has resulted in improper financial reporting that has given rise to the class action. In Mitzner v.
Hastings, 2005 U.S. Dist LEXIS 835 *16 (N.D. Cal., January 14 2005), the court held that in a
derivative case involving allegations of false financial statements, demand futility allegations
against Audit Committee members may suffice because such directors have a "special
relationship" with the Company.

The complaint here alleges a "sustained or systematic failure" to exercise oversight by
the four members of the Audit Committee. Plaintiffs allege that these defendants had access to
internal documents and attended board meetings and were knowledgeable regarding Perkin's
business. ¶78. They clearly allege the duties of the Audit Committee. ¶56-59.  Plaintiffs allege a
lack of internal controls regarding revenue recognition and financial reporting (¶60), with the
result that Perkin's CEO and CFO issued false and misleading statements to the market regarding

the Company's X-ray panels. These allegations raise a strong inference of a sustained or systematic failure of the Audit Committee to do its job.

Plaintiffs' allegations that the Audit Committee directors did nothing to stop the insider trading of Summe and Friel are also probative of demand futility. ¶78(c). In Oxford, 192 F.R.D. at 117-118, the court concluded that insider trading allegations are sufficient to disqualify directors who did not trade. According to the court, "participation in insider trading during the relevant period would create a reasonable doubt concerning the disinterestedness of any Director, and knowledge of or participation in the actions of a friend and colleague in doing so . . . would bear adversely on the independence or disinterestedness of most or all of the Directors." See also In re Storage Technology Sec. Litig., 804 F. Supp. 1368, 1375-1376 (D. Colo. 1992)(holding demand futile where plaintiff alleged, *inter alia*, that "board of directors played a role in the insider trading," "planned, proposed, authorized, approved, or ratified the alleged insider trading," and "allowed" insider trading). Here, given the size and suspicious timing of the trading, it is a reasonable inference that all of the directors were aware of the trading and did nothing to prevent it – especially Friel's $5 million trade, which occurred after Summe's trade.

Plaintiffs further allege that the Audit Committee members either directly participated with Summe in the decisions to release misleading press releases and SEC filings and were aware of their misleading nature, or knew or were reckless in not knowing that such violations were occurring. ¶¶71, 78(g). Such allegations are probative of demand futility. Storage Technology, 804 F. Supp. at 1375-1376 (demand excused where directors, *inter alia*, "disseminated the misleading statements and participated in a conspiracy to conceal the true, adverse information" and "by concealing the true information and issuing misleading statements . . . caused Storage Technology to violate the securities laws and exposed the corporation to significant liability."); Oxford, 192 F.R.D. at 117 ("The Aronson case teaches violations of the

law concerning the dissemination of false and misleading financial statements cannot be deemed to be the product of a valid exercise of business judgment, and therefore protected from a demand futility allegation by the case law.")

**D.       This Board Cannot Act Independently.**

The Delaware test for directorial independence "focuses on whether the directors, for any substantial reason, cannot act with only the best interests of the corporation in mind." In re Oracle Corp. Deriv. Litig., 824 A.2d 917, 937-938 (Del. Ch. 2003). "That is, the Supreme Court cases ultimately focus on impartiality and objectivity." Oracle, 824 A.2d at 938.

Here, plaintiffs have alleged that each of the director defendants other than defendant Summe receives at least $70,000 in cash and stock compensation for their service on the board. Plaintiffs allege that none of these defendants would jeopardize these benefits (or the prestige of serving on the board of a large publicly traded corporation like Perkin) by taking a position adverse to defendant Summe, the Chairman of the Board and the Company's dominant officer. Indeed, these defendants have shown that they defer to Summe. The Company's own disclosures show that in 2001, the board awarded Summe an "additional bonus" of $815,000 above and beyond his ordinary incentive pay, and forgave a $875,000 loan Summe owed Perkin. ¶63.

These allegations, along with Summe's series of misleading statements, demonstrate "a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling" – Summe. See Aronson, 473 A. 2d at 816. See also Storage Technology, 804 F. Supp. 1375-76 (crediting demand futility allegation that "board of directors' independence is untrustworthy because the board would never sue Poppa, Storage Technology's chairman of the board, chief executive officer, president, and one of the alleged insider traders.")  These allegations are properly considered as part of the "accumulation" of facts demonstrating the futility of any demand. McCall, 239 F. 3d 816.

**E.      Perkin's Exculpation Provision Does Not Dispose Of Plaintiffs' Claims.**

Defendants argue that the claims should be dismissed because, "at best," the complaint alleges only a duty of care claim. According to defendants, pursuant to Massachusetts law, Perkin's articles of organization "eliminate" personal liability for breach of the duty of care by the directors, and therefore no substantial likelihood of personal director liability exists.

Defendants concede, however, that such an exculpation clause may not be relied upon where the complaint alleges a breach of the duty of loyalty, or acts or omissions not in good faith. Indeed, an exculpatory clause bars a complaint at the motion to dismiss stage only if it states an "unambiguous, residual" breach of the duty of care claim, and nothing else. Malpiede v. Townson, 780 A.2d 1075, 1094 (Del. 2001); Emerald Partners v. Berlin, 787 A.2d 85, 91 (Del. Ch. 2001) (if shareholder unambiguously asserts only a due care claim, the complaint may be dismissible under Section 102(b)(7)).

Here, plaintiffs assert claims of breach of the duty of loyalty and bad faith conduct that go well beyond simple duty of care claims. Plaintiffs have alleged a breach of the duty of loyalty on the part of defendant Summe, and have alleged that the Audit Committee members acted in bad faith by failing to ensure that a reasonable system of internal controls existed at the Company while on notice of "red flags." Therefore, the exculpatory provision does not apply.

Furthermore, "where the complaint sufficiently alleges a breach of fiduciary duties based on a failure of the directors to act in good faith, bad faith actions present a question of fact that cannot be determined at the pleading stage." In re Abbott Lab. Deriv. Litig., 325 F.3d 795, 811 (7th Cir. 2003). Plaintiffs' allegations of bad faith clearly rise to this level.

**F.      Plaintiffs' Damage Allegations Are Ripe.**

Defendants are mistaken in their assertion that that this action is not ripe for adjudication. First, plaintiffs seek damages that are unrelated to the outcome of the class action. These include

Summe's and Friel's $14 million in insider trading proceeds which must be disgorged to the

Company pursuant to plaintiffs' insider trading claim, and defendant Summe's incentive-based

compensation, which must be returned to the Company pursuant to plaintiffs' unjust enrichment

claim. &&61-64. These are specific, measurable damages which may be recovered now.

Furthermore, this action seeks recovery for the legal expenses Perkin has incurred and

continues to incur in connection with defending the class action. &75.  These damages are not

speculative and are the proper subject of a shareholder derivative action. <u>In re Cendant Corp</u>

<u>Deriv. Litig.</u>, 189 F.R.D. 117, 135 (D.N.J. 1999)(holding derivative claim for legal expenses

already incurred in related securities fraud action ripe for adjudication); <u>Sonkin v. Barker</u>, 670 F.

Supp. 249, 253 (S.D. Ind. 1987) (damages ripe where plaintiffs alleged, among other things,

"damages for [the company's] expenditures for legal and other professional fees.")

Contrary to defendants' argument that such damages are speculative, "[d]amage to one's

business and reputation is a cognizable injury for which damages may be awarded if the

underlying charges are proved." <u>Cendant</u>, 189 F.R.D. at 135. Indeed, derivative plaintiffs may

seek recovery on behalf of the corporation for "its loss of present and future business

opportunities, its increased interest expense, its difficulty in obtaining credit and raising funds

via issuance of public securities, and the harm to its business reputation and standing in the

community." <u>Sonkin</u>, 670 F. Supp. at 253. These are the types of damages plaintiffs specifically

allege. &&68-76. Accordingly, this action is not premature.

Furthermore, the cases cited by defendants stress that the reason for holding those

derivative claims to be premature was because they were predicated on "the mere filing of

lawsuits," <u>Daisy Sys. Corp. v. Finegold</u>, 1998 WL 166235 at *4 (N.D. Cal. Sept. 19, 1988), or on

a "potentially baseless suit." <u>In re Symbol Tech. Sec. Litig.</u>, 762 F. Supp. 510, 516 (E.D.N.Y.

1991).  Here, by contrast, this Court has already sustained the related securities fraud complaint

against the Company.  Thus, it is far from "speculative" that the Company will be found liable

for violations of the federal securities laws, which violations were caused by the defendants'

breaches of their fiduciary duties. Defendants' reliance on <u>In re United Telecommunications Inc.</u>

<u>Sec. Litig.,</u> 1993 WL 100202 (D. Kan., March 4, 1993) is also misplaced.  In that case, the

complaint was dismissed in part because plaintiff relied on allegations of "potential" damages

arising out of a class action suit, and had otherwise failed to allege particularized harm.  In

contrast, plaintiffs have pleaded specific and identifiable injury.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss should be denied. In the

alternative, if the motion is granted in any respect, plaintiffs request leave to amend.


DATED:   October 17, 2005                    **THE LAW OFFICES OF PETER LAGORIO**


                                             By: _/s/ Peter A. Lagorio_____
                                             Peter A. Lagorio
                                             63 Atlantic Avenue
                                             Boston, MA 02119
                                             Telephone: (617) 367-4200

                                             **SCHUBERT & REED LLP**
                                             Robert C. Shubert (BBO No. 562242)
                                             Juden Justice Reed
                                             Willem F. Jonckheer
                                             Two Embarcadero Center, Suite 1660
                                             San Francisco, CA 94111
                                             Telephone: (415) 788-4220

                                             **WECHSLER HARWOOD LLP**
                                             Robert I. Harwood
                                             Peter W. Overs, Jr.
                                             488 Madison Avenue
                                             New York, New York 10022
                                             Telephone: (212) 935-7400

**LOWEY DANNENBERG BEMPORAD &
  SELINGER, P.C.**
Richard Bemporad
David Harrison
One North Lexington Avenue, 11th Floor
White Plains, NY 10601
Telephone: (914) 997-0500

Attorneys for Plaintiffs